## CITY OF MONROE ET AL. *v.* UNITED STATES

No. 97–122.   Decided November 17, 1997

PER CURIAM.

The United States claims the city of Monroe, Georgia, did not seek preclearance for majority voting in mayoral elections, as required by § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c. The Government seeks to enjoin majority voting and to require Monroe to return to the plurality system it had once used. A three-judge District Court for the Middle District of Georgia agreed with the Government and granted summary judgment. 962 F. Supp. 1501 (1997). The District Court rejected Monroe's claim that the Attorney General's preclearance of a 1968 statewide law encompassed Monroe's adoption of a majority system. On Monroe's motion, this Court stayed enforcement of the judgment. 521 U. S. 1138 (1997). The case is now on appeal, and the judgment must be reversed.

I

The parties agree upon the facts. Until 1966, Monroe's city charter did not specify whether a candidate needed a plurality or a majority vote to win a mayoral election. In practice, the city used plurality voting in its elections until 1966 and majority voting thereafter.

In 1966, the General Assembly of Georgia amended the city's charter to require majority voting in mayoral elections. 1966 Ga. Laws 2459. Because Monroe is a jurisdiction covered by § 5 of the Voting Rights Act, the change had to be precleared. Georgia or Monroe could have sought preclearance by submitting the change to the Attorney General or seeking a declaratory judgment from the United States District Court for the District of Columbia. Neither did, so the 1966 charter amendment was not precleared.

In 1968, the General Assembly passed a comprehensive Municipal Election Code (1968 code), which is still in force today. The statute applies to Monroe and all other municipalities in Georgia. Section 34A–1407(a) of the 1968 code

has two sentences. The first sentence sets forth a rule of deference to municipal charters:

> "If the municipal charter . . . provides that a candidate may be nominated or elected by a plurality . . . , such provision shall prevail."

The second sentence lays down a state-law default rule for all other cities:

> "Otherwise, no candidate shall be . . . elected . . . [without] a majority of the votes cast . . . ." Georgia Municipal Election Code, § 34A–1407(a) (1968 code section or § 34A–1407(a)), 1968 Ga. Laws 977, as amended, Ga. Code Ann. § 21–3–407(a) (1993).

Georgia submitted the 1968 code to the Attorney General for preclearance. Its cover letter stated: "'In view of the variety of laws which heretofore existed, no effort will be made herein to set forth the prior laws superseded by the Municipal Election Code.'" 962 F. Supp., at 1505. The letter then listed the majority-vote provision as a significant change, noting: "'Whether the majority or plurality rule is in effect in the municipal election will depend upon how the municipality's charter is written at present or may be written in [the] future . . . .'" *Ibid.* The Attorney General objected to other provisions of the 1968 code but did not object to § 34A–1407(a), so it was, and is, precleared. The United States does not dispute this conclusion, nor does it claim Georgia's submission was misleading, ambiguous, or otherwise defective.

In 1971, the General Assembly passed a comprehensive revision of Monroe's charter. 1971 Ga. Laws 3227. The 1971 charter made explicit provision for majority voting. Neither Georgia nor Monroe sought to preclear the revisions to the charter.

In 1990, the General Assembly once again amended Monroe's charter and carried forward the majority-vote requirement. This time, Monroe sent the 1990 charter to the Attor-

ney General for preclearance, but the cover letter did not mention the majority-vote provision. The Attorney General objected to it nevertheless, interpreting the submission as effecting a change from plurality to majority voting. The Government filed suit against Monroe and city officials in 1994 and prevailed in the District Court.

## II

The 1968 code must be the centerpiece of this case, for it defers where city charters are specific and provides a default rule where they are not. If a city charter requires plurality voting, the deference rule in the first sentence of the 1968 code section allows the municipal charter provision to take effect. Monroe, however, does not have and has not had a plurality-vote provision in its charter. The first sentence simply does not apply here because no charter provision triggers its rule of deference to municipal law. Thus, the second sentence's default rule of state law governs, requiring Monroe to use majority voting. Since the Attorney General precleared the default rule, Monroe may implement it.

The District Court reached a contrary conclusion, relying on a single footnote in *City of Rome* v. *United States*, 446 U. S. 156, 169–170, n. 6 (1980). As the District Court put it: "The *[Rome]* Court's rationale focused squarely on the notion that [Georgia's] submission of the 1968 Statewide Code did not put before the Attorney General the propriety of changes in the voting practices of individual cities." 962 F. Supp., at 1513.

The court's reliance on the footnote was misplaced. Unlike this case, which concerns the default rule in the second sentence of the 1968 code section, the *City of Rome* footnote concerned the deference rule in the first sentence. Rome's pre-1966 charter had an explicit requirement of plurality voting. When the General Assembly amended Rome's charter to provide for majority voting, no one sought to preclear this or other changes. "Rome [later] argue[d] that the Attorney

General, in preclearing the 1968 Code, [had] thereby approved by reference the City's 1966 Charter amendments." *City of Rome* v. *United States*, 472 F. Supp. 221, 233 (DC 1979), aff'd, 446 U. S. 156 (1980); see also 472 F. Supp., at 233 ("Rome argues that its Charter, having been amended in 1966 to provide for majority voting, did not provide for plurality voting in 1968, and that therefore the 1968 Code mandated majority voting").

This Court rejected Rome's claim because the submission of the 1968 code did not submit Rome's 1966 charter for preclearance "in an unambiguous and recordable manner." 446 U. S., at 170, n. 6 (internal quotation marks omitted). Georgia's submission of the 1968 code "informed the Attorney General only of [Georgia's] *decision to defer to local charters* and ordinances regarding majority voting" should a city choose to include a voting provision in its charter as permitted by the deference rule. *Ibid.* (internal quotation marks omitted; emphasis added). Georgia's submission of the 1968 code did not give the Attorney General "an adequate opportunity to determine the purpose of [Rome's 1966] electoral changes and whether they will adversely affect minority voting." *Id.,* at 169, n. 6.

Indeed, Georgia's submission of the 1968 code did not even arguably constitute a request for preclearance of the 1966 change to Rome's charter. Given that the unprecleared charter amendment was a nullity as a matter of federal law, the 1968 code did not change the law in Rome. Rather, it deferred to the plurality-vote requirement in the pre-1966 charter. In this case, however, the 1968 code is what changed the law in Monroe. Accordingly, unless the Attorney General's preclearance of the code was a nullity, there has been no violation of the Voting Rights Act.

In short, *City of Rome* rejected Rome's effort to use the submission of the 1968 code to validate the 1966 municipal electoral changes. *City of Rome*, in discussing the "decision to defer to local charters," recognized that the case arose

under the rule of deference to municipal law. This rule of deference would not have been interpreted to effect a change in the law, and so it did not put the Attorney General on notice of Rome's shift to majority voting. Because municipal law was dispositive under the first sentence of the 1968 code section, *City of Rome* said nothing about the state-law default rule of majority voting in the second sentence.

The instant case, in contrast, is controlled by the default rule of state law set forth in the second sentence. Monroe's pre-1966 charter, unlike Rome's, did not require plurality voting and so could not trigger the rule of deference to municipal law in the first sentence. Thus Monroe, unlike Rome, does not need to breathe life into its invalid 1966 charter to circumvent the rule of deference. After one disregards Monroe's invalid 1966 and 1971 charters, the state-law default rule mandates majority voting.

Cases, such as this one, arising under the default rule satisfy all of the preclearance requirements in *City of Rome*. The Government does not dispute that Georgia submitted the state-law default rule to the Attorney General in an "unambiguous and recordable manner." The submission, furthermore, gave the Attorney General "an adequate opportunity to determine the purpose of the [default-rule] electoral changes and whether they will adversely affect minority voting." In consequence, by preclearing the 1968 code the Attorney General approved the state-law default rule. The controlling default rule having been precleared, Monroe may conduct elections under its auspices.

Because the 1968 code disposes of the case on this undisputed factual record, the Court need not address appellants' other contentions. The judgment of the District Court is

*Reversed.*

JUSTICE SCALIA, concurring in the judgment.

Although I agree with the result reached by the Court, my reasoning is somewhat different. Like JUSTICE BREYER, I

believe that without knowledge of the contents of city charters the Attorney General could no more have known the precise practical effect of the second sentence of the Georgia statute than he could have known the precise practical effect of the first, see *post*, at 47–48. But there is, nonetheless, a critical difference between the two sentences. As far as appears, the first sentence (giving effect to plurality voting provisions contained in municipal charters) does not effect any change in voting. To think it did, one would have to suppose that prior to the statute various municipalities were ignoring their charters, which is most unlikely. So the first sentence did not inform the Attorney General "in some unambiguous and recordable manner" that a change was afoot, see *City of Rome* v. *United States*, 446 U. S. 156, 169, n. 6 (1980) (internal quotation marks omitted).

The second sentence, however, sets forth a default rule of majority voting for all municipalities that have not treated the matter in their charters. To think that this effects a change, one need only believe that some municipalities have no charter provision on point, and that a subset of those have adopted a practice of plurality voting. Such a belief is not only reasonable; it is virtually essential unless one is to consider the statute pointless. As to the second sentence, therefore, the Attorney General ought to have known that he was approving a switch to majority voting in some municipalities. If that seemed to him possibly troublesome, I think the burden was upon him to inquire further, and not upon the State, every time it enacts a statewide statute affecting voting, to submit a city-by-city breakdown of the consequences. *City of Rome* need not and should not be extended that far.

JUSTICE SOUTER, with whom JUSTICE BREYER joins, dissenting.

In 1968 the Georgia Legislature enacted a Municipal Election Code with the following provisions governing the alternatives of plurality and majority voting:

"If the municipal charter . . . provides that a candidate may be nominated or elected by a plurality of the votes cast . . . , such provision shall prevail.  Otherwise, no candidate shall be . . . elected to public office in any election unless such candidate shall have received a majority of the votes cast . . . ."  Georgia Municipal Election Code, § 34A–1407(a), 1968 Ga. Laws 977, as amended, Ga. Code Ann. § 21–3–407(a) (1993).

These provisions were applicable in ways that would result in no changes in election practices in communities whose charters (so far as otherwise enforceable) provided that a plurality would suffice, whose charters provided that a majority was required, or whose charters were silent but whose practices had been to require a majority.  The first sentence quoted from the code (deferring to plurality provisions) would confirm the practice in the first class of municipalities, while the second sentence (a default provision requiring a majority in all other cases) would confirm the practices in the second and third classes.  The new code would, however, require a change in the practice in any community whose municipal charter (so far as otherwise enforceable) was silent on the plurality-majority issue, but in which the practice had been to accept a plurality as sufficient.

The 1968 code was submitted to the Attorney General of the United States for preclearance under § 5 of the Voting Rights Act, 42 U. S. C. § 1973c (since the entire State of Georgia was, and remains, subject to § 5), and the Attorney General approved the provisions in question.  In two instances we have been presented with a question whether application of the default provision to effect a change in practice to majority voting was precleared by virtue of the blanket preclearance of the default provision.  In the first case, *City of Rome* v. *United States*, 446 U. S. 156 (1980), we answered no; in the second case, this one, the answer should be the same.

In Rome's case, the charter provision that was valid and enforceable when the 1968 code was precleared provided expressly for plurality voting.  Therefore, the code's deference

provision applied and the plurality rule remained the rule under the code. Rome argued, however, that the default provision should be applied so as effectively to validate an unprecleared 1966 municipal charter change to an express majority requirement. This Court rejected the argument in these words:

"We also reject the appellants' argument that the majority vote, runoff election, and numbered posts provisions of the city's charter have already been precleared by the Attorney General because in 1968 the State of Georgia submitted, and the Attorney General precleared, a comprehensive Municipal Election Code that is now Title 34A of the Code of Georgia. Both the relevant regulation, 28 CFR § 51.10 (1979), and the decisions of this Court require that the jurisdiction 'in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act,' *Allen* v. *State Board of Elections,* 393 U. S. 544, 571 (1969), and that the Attorney General be afforded an adequate opportunity to determine the purpose of the electoral changes and whether they will adversely affect minority voting in that jurisdiction, see *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110, 137–138 (1978). Under this standard, the State's 1968 submission cannot be viewed as a submission of the city's 1966 electoral changes, for, as the District Court noted, the State's submission informed the Attorney General only of 'its decision to defer to local charters and ordinances regarding majority voting, runoff elections, and numbered posts,' and 'did not . . . submit in an "unambiguous and recordable manner" all municipal charter provisions, as written in 1968 or as amended thereafter, regarding these issues.' 472 F. Supp. 221, 233 (DC 1979)." 446 U. S., at 169–170, n. 6.

Since the Attorney General had never been shown Rome's 1966 municipal charter change (much less precleared it), he had never had an "adequate opportunity" to determine the purpose and effect of the proposed "electoral chang[e]" from plurality to majority, not in 1966 (because preclearance had not been sought) and not in 1968 (because he was not apprised of the purported 1966 change necessary to produce a majority vote requirement under the 1968 code).

Monroe now claims the benefit of the 1968 code's default provision, in circumstances just like Rome's, with one distinction. Monroe, too, obtained a 1966 charter change purporting to enact a majority requirement, for which Monroe, too, failed to seek preclearance. But Monroe could arguably enforce a majority requirement even if the 1966 unprecleared charter amendment were ignored, simply by applying the code's default provision to the circumstances that preceded the unprecleared 1966 amendment: before that amendment, although Monroe's charter was silent on the plurality-majority issue, the municipal practice (perfectly valid for purposes of § 5) was to accept a plurality as sufficient. Thus, the unprecleared 1966 charter change could be ignored in Monroe's case (as it was in Rome's) and the default provision of the 1968 code would make Monroe a majority vote municipality.

As a predicate for applying the 1968 code to effect majority voting requirements, however, this distinction between Rome's unprecleared 1966 change and Monroe's valid pre-1966 silent charter is not entitled to make any difference. The object of the preclearance requirement is, at a minimum, to apprise the Attorney General of any change in voting practice. Section 5 requires preclearance not only in the case of a change of a voting "standard" that was not in place when the Voting Rights Act took effect, but also of a change in a "practice" or "procedure." 42 U. S. C. § 1973c. The point of the preclearance procedure is to determine whether the change proposed reflects either a "purpose" or will have

the "effect" of forbidden abridgment of voting rights. *Ibid.* A new practice and a new effect could result not only from applying the code's default provision to an invalid (because unprecleared) charter revision, but also from applying it to a perfectly valid charter provision and practice. In either case, on the sensible reasoning of *City of Rome,* there can be no preclearance of a new practice unless the Attorney General is unambiguously put on notice of it. See 446 U. S., at 169–170, n. 6. Thus, Monroe is in no different position from Rome. Neither Rome nor the State ever disclosed the 1966 charter change on which the default provision might operate to provide a new majority vote requirement; neither Monroe nor the State ever disclosed the pre-1966 charter silence on which the default provision might operate to provide a new majority vote requirement. Alternative analyses, leading to the conclusion that the Attorney General's preclearance of the relevant section of the 1968 code also precleared its undisclosed effects, are not only at odds with the unambiguous language of § 5 of the Voting Rights Act, but imply that the Attorney General was quite the cavalier when he approved the default provision in 1968. Since no particular charter provisions were submitted to him along with the 1968 code, *City of Rome, supra,* he was not on notice of any particular effect that might result from application of the default provision. It is therefore unreasonable to suppose that his approval of the code was meant to preclear its undisclosed applications even as to otherwise valid charter provisions and municipal practices.*

---

*My analysis entails a modest but nonetheless discernible scope for the Attorney General's preclearance of the 1968 deferral and default provisions. The preclearance may have left the provisions enforceable insofar as they would result in ratification of prior, valid municipal practices (assuming that preclearance was necessary as to such applications); in any case, the preclearance amounted to findings that the default provision did not as such represent an intent to affect minority voting adversely, and that some applications of the provision would presumably be possible without adverse effects.

JUSTICE BREYER, with whom JUSTICE SOUTER joins, dissenting.

*City of Rome* v. *United States*, 446 U. S. 156 (1980), focused upon a change in Rome, Georgia's, method of electing city officials—a change from "first-past-the-post" (plurality wins) to "run-off" (majority needed to win). The change took place in 1966. The change was of a kind that could have made it more difficult for newly enfranchised black voters to elect a mayor (*e. g.*, where the black population of a town amounted, say, to 35% of all voters). The change had not been precleared, though § 5 of the Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973c, required preclearance. In 1968, however, Georgia had precleared a different change in its law. Georgia had submitted, and the Attorney General had precleared, a comprehensive Municipal Election Code that provided, in relevant part:

> "If the municipal charter . . . provides that a candidate may be nominated or elected by a plurality of the votes cast . . . , such provision shall prevail. Otherwise, no candidate shall be . . . elected to public office in any election unless such candidate shall have received a majority of the votes cast . . . ." Georgia Municipal Election Code, § 34A–1407(a), 1968 Ga. Laws 977, as amended, Ga. Code Ann. § 21–3–407(a) (1993).

Rome argued that the Attorney General's preclearance of this 1968 change in effect precleared the plurality-to-majority change that Rome had made two years earlier. The Court rejected Rome's argument.

The case before us now involves another Georgia city, the city of Monroe. Monroe, like Rome, made a change in its system for electing city officials—a change from "first-past-the-post" (plurality wins) to "run-off" (majority needed to win). Monroe, like Rome, made the change in 1966. And, Monroe's change, like Rome's change, was not precleared. Monroe, like Rome, argues that the Attorney General's pre-

clearance of Georgia's 1968 change in effect precleared its change to a majority system. Monroe acknowledges that this Court, in *City of Rome, supra,* rejected Rome's similar claim. But it asks us to note probable jurisdiction in part to "address the impact of the Attorney General's preclearance of the 1968 Municipal Elections Code as it relates to the majority vote requirement." Juris. Statement 17. In my view, the circumstances here are virtually identical to those at issue in *City of Rome,* and this Court's rejection of Rome's argument there requires us to reject Monroe's similar argument here.

I rest this conclusion upon what the parties argued before the Court in *City of Rome* and what the Court wrote. Rome, like Monroe, claimed that, in preclearing the 1968 statewide statute, the Attorney General had precleared its local majority system. The reply, by the United States, in *City of Rome,* included the following argument:

> "In its 1968 submission, the State did not 'submit' the changes as they applied to the City of Rome. There was no explanation of how, or even whether, the City's procedures were changed. In order to 'submit' a new procedure, the change must be clearly explained to the Attorney General, 28 C.F.R. 51.10; he cannot reasonably be held to be put on notice of the election procedures for every municipality when an act with statewide effect is submitted. As this Court [has] held, preclearance cannot occur until the particular change has been submitted to the Attorney General and he has been afforded an opportunity to assess its purpose and its effect on minority voting in *that* jurisdiction." Brief for Appellees in *City of Rome* v. *United States,* O. T. 1979, No. 78–1840, pp. 69–70 (citation omitted).

This Court, accepting the argument of the United States, wrote:

"Both the relevant regulation, 28 CFR §51.10 (1979), and the decisions of this Court require that the jurisdiction 'in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act,' and that the Attorney General be afforded an adequate opportunity to determine the purpose of the electoral changes and whether they will adversely affect minority voting in that jurisdiction. Under this standard, the State's 1968 [preclearance] submission cannot be viewed as a submission of the city's 1966 electoral changes, for, as the District Court noted, the State's submission informed the Attorney General only of 'its decision to defer to local charters and ordinances regarding majority voting, . . .' and 'did not . . . submit in an "unambiguous and recordable manner" all municipal charter provisions, as written in 1968 or as amended thereafter, regarding th[is] issu[e].' " *City of Rome* v. *United States, supra,* at 169–170, n. 6 (citations omitted).

It seems to me that this statement disposes of the case before us. The statement points out that Georgia's 1968 submission did not describe the effect of its 1968 changes, town by town, in each of Georgia's more than 500 towns and cities. The statement specifically says that Georgia's simple "submission" of its 1968 comprehensive municipal code did not preclear Rome's "1966 electoral chang[e]" because Georgia did not also "submit" the relevant "municipal charter provisions, as written in 1968 or as amended thereafter." Georgia did not submit Monroe's charter to the Attorney General in 1968 any more than it submitted Rome's; nor is there any reason to believe that the Attorney General knew the details of Monroe's circumstances any more than he knew the details of Rome's. Hence, as the District Court concluded in this case, the 1968 preclearance did not preclear Monroe's earlier 1966 change. *City of Rome, supra.*

48

The majority's decision to the contrary rests upon one factual difference between Rome and Monroe. The difference consists of the fact that Rome's original pre-1966 "first-past-the-post" plurality system was written into Rome's city charter. But Monroe's original pre-1966 "first-past-the-post" plurality system was a matter of practice. Its pre-1966 city charter was silent. This difference means that, had a court set aside the 1966 changes in each city, and were no other change to have taken place, then Rome would have been left with a city charter that prescribed a plurality rule, while Monroe would have been left with a silent city charter and a plurality practice. The precleared 1968 state law, if left free to operate on these different circumstances, would have left Rome with a plurality rule (for its pre-1966 city charter contained that rule), but would have changed Monroe's plurality practice to a majority practice (for its pre-1966 city charter was silent).

This complex difference, in my view, is irrelevant. The Attorney General, in 1968, was no more likely to have known about Monroe's change from "plurality-practice" to "majority-charter" than to have known about Rome's change from "plurality-charter" to "majority-charter." Nor is there any reason to believe the Attorney General, in 1968, would. have wanted to approve previously unprecleared changes of the former, but not of the latter, variety. There is no more reason to believe that the Attorney General, had he known about Monroe's 1966 change, would have approved the application of the 1968 law to Monroe, than to believe that the Attorney General, had he known about Rome's change, would have approved the application of the 1968 law to Rome. Indeed, if Monroe's black population in 1966 was as high as it is today (37% of the electorate), Monroe's change to a majority vote system could have been precisely the sort of discriminatory change at which the Voting Rights Act was directed.

The majority, and JUSTICE SCALIA, make a further argument resting upon a distinction between the first and second sentences of the 1968 code that the Attorney General precleared. The majority says, for example, that *City of Rome* "said nothing about the state-law default rule of majority voting in the second sentence," *ante,* at 39; and JUSTICE SCALIA refers to a "second sentence . . . default rule of majority voting for all municipalities that have not treated the matter in their charters," *ante,* at 40. The majority then finds that the Attorney General precleared the second-sentence default rule as applied to Monroe, apparently because it believes that "[t]he Government does not dispute that Georgia submitted the state-law default rule to the Attorney General in an 'unambiguous and recordable manner,'" *ante,* at 39. JUSTICE SCALIA reaches the same conclusion, not because of the Government's position, but because, in his view, the "burden was upon" the Attorney General to seek more information about the "city-by-city" effects of the statute at the time it was submitted. *Ante,* at 40.

A glance at the Georgia statute, *supra,* at 45, will make clear, however, just how finely the majority has had to parse the statute in its effort to escape the binding effect of precedent. That is because *City of Rome* (involving a city with a "majority" charter) and this case *both* concern the statute's *second* sentence. See Brief for Appellants in *City of Rome* v. *United States,* O. T. 1979, No. 78–1840, p. 90; *City of Rome* v. *United States,* 472 F. Supp. 221, 233 (DC 1979) ("Rome argues that . . . the 1968 Code *mandated* majority voting") (emphasis added). And nowhere does either the statute's second sentence or *City of Rome* explicitly make the default/deference distinction that the majority finds critical.

More importantly, there is no reason to think the distinction is critical in respect to the matter here at issue. The Government has not conceded, silently or otherwise, that the Attorney General's preclearance of a statutory "default rule" somehow precleared the application of some such rule to

Monroe. To the contrary, the Government's argument, which concerns *all* applications of the "majority" language in the 1968 code's second sentence, is that:

> "[P]reclearance of the majority vote provision incorporated in the State of Georgia's 1968 Municipal Election Code did not also preclear the prior or subsequent adoption and implementation of a majority vote requirement by any particular municipality within the State." Motion to Affirm 11.

That argument rather clearly says that the Attorney General, in effect, precleared the Georgia statute on its face, not as applied to each of Georgia's several hundred municipalities. That is the very argument that the Government made, and the Court accepted, in *City of Rome.*

JUSTICE SCALIA does not take the majority's view of the Government's argument. Rather, he says that, in any event, the Attorney General's initial preclearance of the second sentence simultaneously precleared that sentence's application because the State's submission was detailed enough to impose upon the Attorney General the "burden" of seeking detailed city-by-city information. *Ante,* at 40. In my view, however, precedent compels a contrary conclusion. In respect to the relevant point—whether the Attorney General cleared the statute on its face or also as applied—one cannot distinguish the issue before us from the (in this respect) identical issue in *City of Rome.* And that conclusion is consistent with well-established legal principle. See *Clark* v. *Roemer,* 500 U. S. 646, 656 (1991) ("[A]ny ambiguity in the scope of a preclearance request must be resolved against the submitting authority"); *McCain* v. *Lybrand,* 465 U. S. 236, 257 (1984) (same); 28 CFR §§ 51.26(d), 51.27(c) (1997) (requiring preclearance submissions to explain changes clearly and in detail).

In a nutshell, *City of Rome* turns on the practical fact that the Attorney General, in preclearing the 1968 Georgia

statute, would not have intended to preclear earlier, potentially unlawful, local changes of which he had not specifically been told. Rome was one such city. Monroe was another. The District Court consequently concluded that the Attorney General's preclearance of the 1968 statute did not preclear Monroe's earlier change, any more than it did Rome's. I agree with the District Court and would affirm its judgment.