LOPEZ ET AL. *v.* MONTEREY COUNTY ET AL.

No. 97–1396.   Argued November 2, 1998—Decided January 20, 1999

268

*Joaquin G. Avila* argued the cause for appellants. With him on the briefs were *Denise Hulett* and *Robert Rubin*.

*Paul R. Q. Wolfson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Hodgkiss, Deputy Solicitor General Underwood, Mark L. Gross, Rebecca K. Troth*, and *Louis E. Peraertz.*

*Daniel G. Stone*, Deputy Attorney General of California, argued the cause for the state appellee. With him on the brief were *Daniel E. Lungren*, Attorney General, *Linda A. Cabatic*, Senior Assistant Attorney General, and *Marsha A. Bedwell*, Supervising Deputy Attorney General. *Douglas C. Holland* filed a brief for appellee Monterey County.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Under the Voting Rights Act of 1965 (Act or Voting Rights Act), 79 Stat. 437, as amended, 42 U. S. C. § 1973 *et seq.*, des-

---

*\*Deborah J. La Fetra* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

ignated States and political subdivisions are required to obtain federal preclearance before giving effect to changes in their voting laws. See § 1973c. Here, the State of California (California or State), which is not subject to the Act's preclearance requirements, has passed legislation altering the scheme for electing judges in Monterey County, California (Monterey County or County), a "covered" jurisdiction required to preclear its voting changes. In this appeal, we review the conclusion of a three-judge District Court that Monterey County need not seek approval of these changes before giving them effect. The District Court reasoned, specifically, that California is not subject to the preclearance requirement and that Monterey County merely implemented a California law without exercising any independent discretion. We hold that the Act's preclearance requirements apply to measures mandated by a noncovered State to the extent that these measures will effect a voting change in a covered county. Accordingly, we reverse the decision of the District Court.

## I

The instant appeal marks the second occasion on which this Court has addressed issues arising in the course of litigation over the method for electing judges in Monterey County, and we assume familiarity with our previous decision in this case. See *Lopez* v. *Monterey County*, 519 U. S. 9 (1996).

## A

Congress enacted the Voting Rights Act under its authority to enforce the Fifteenth Amendment's proscription against voting discrimination. The Act contains generally applicable voting rights protections, but it also places special restrictions on voting activity within designated, or "covered," jurisdictions. Jurisdictions—States or political subdivisions—are selected for coverage if they meet specified criteria suggesting the presence of voting discrimination in

the jurisdiction. The criteria pertinent to this case were established by a 1970 amendment to the Act that extended coverage to any jurisdiction that "(i) the Attorney General determines maintained on November 1, 1968, any test or device [as a prerequisite to voting], and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968." 84 Stat. 315, 42 U. S. C. § 1973b(b).

The Act subjects covered jurisdictions to special restrictions on their voting laws. Section 4(a) suspends use of a "test or device" in any jurisdiction designated for coverage. § 1973b(a)(1). In addition, § 5 of the Act provides that covered jurisdictions must obtain federal approval for any measure that departs from the voting scheme in place in the jurisdiction on a specified date. The portion of § 5 applicable in this case provides, specifically, that federal preclearance is required "whenever a [covered] State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968." § 1973c.

A covered jurisdiction has two avenues available to seek the federal preclearance required under § 5. The jurisdiction may submit the proposed voting change to the Attorney General. If the Attorney General affirmatively approves the change or fails to object to it within 60 days, the change is deemed precleared and the jurisdiction may put it into effect. *Ibid.* Alternatively, either in the first instance or following an objection from the Attorney General, a covered jurisdiction may seek preclearance for a voting change by filing a declaratory judgment action in the United States District Court for the District of Columbia. *Ibid.* The change is precleared if the court declares that the proposed

"qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [proscribing voting restrictions based on membership in a language minority group]." § 1973c.

In 1971, Monterey County was designated a covered jurisdiction based on findings that, as of November 1, 1968, the County maintained California's statewide literacy test as a prerequisite to voting and less than 50 percent of the County's voting age population participated in the November 1968 Presidential election. 35 Fed. Reg. 12354 (1970); 36 Fed. Reg. 5809 (1971); see also 42 U. S. C. § 1973b(b). Accordingly, the County must obtain federal preclearance for any departure from the voting scheme in place on November 1, 1968.

In fact, over the last 30 years, there have been numerous changes in the structure of the County's trial court system and the scheme for electing judges. On November 1, 1968, Monterey County had nine judicial districts: two municipal court and seven justice court districts. As we observed in our earlier opinion, see Lopez v. Monterey County, supra, at 12, municipal court districts encompassed larger populations than their justice court counterparts, and the former districts had two judges whereas the latter had one. Moreover, justice courts were not courts of record, and their judges frequently worked part time. Each of the nine districts in place in 1968 was wholly independent, and its judges were elected at large by voters in the district in which they served.

Since 1972, however, the County's judicial system has undergone substantial change resulting in what is today a single, countywide municipal court served by 10 judges. Four County ordinances adopted between 1972 and 1976 reduced the number of justice court districts in the County

from seven to three.* Subsequently, a 1977 state law transformed a justice court district into a municipal court district, raising the total number of municipal districts to three. 1977 Cal. Stats., ch. 995.

The next noteworthy change in the County's judicial election scheme occurred in 1979, with the consolidation of the County's three municipal court districts. On June 5, 1979, the County passed Ordinance No. 2524, which provided that the Monterey Peninsula Judicial District, North Monterey County Judicial District, and the Salinas Judicial District would be combined to form the Monterey County Municipal Court District. App. to Juris. Statement 75. The same year, the State enacted a law, apparently at the County's request, requiring the same merger of the municipal court districts and mapping out some of the mechanics of the new, consolidated district. 1979 Cal. Stats., ch. 694; see also § 4 (noting that "this act is in accordance with the request of a local governmental entity or entities which desired legislative authority to carry out the program specified in this act"). The state Act provides, in pertinent part, that "[t]here is in the County of Monterey, on and after the effective date of this section, a single municipal court district which embraces the former Salinas Judicial District, Monterey Peninsula Judicial District and North Monterey County Judicial District." § 2. The 1979 changes thus left the County with one municipal court district and two justice court districts.

The final step toward a single, countywide district occurred in 1983. County Ordinance No. 2930, passed by Monterey County's Board of Supervisors on August 2, 1983,

---

*County Ordinance No. 1917, adopted on October 3, 1972, consolidated two justice court districts. App. to Juris. Statement 56–57. On November 13, 1973, County Ordinance No. 1999 consolidated another two justice court districts. Id., at 58–59. County Ordinance No. 2139, adopted on January 13, 1976, merged three justice court districts with other judicial districts. Id., at 62–64. Finally, County Ordinance No. 2212, adopted on September 7, 1976, added a new justice court district. Id., at 68–70.

merged the remaining two justice court districts into the municipal court district formed by the 1979 consolidation. App. to Juris. Statement 77–80. The merger became effective on January 1, 1984, and the resulting district was countywide. The State, again apparently at the County's request, enacted legislation in September 1983, increasing the number of judges in the County's municipal court district from seven to nine contingent upon the merger of the justice court districts already provided for by the County ordinance. 1983 Cal. Stats., ch. 1249, §§ 3, 16. The State subsequently recognized that the merger had taken effect and provided for the additional judgeships. 1985 Cal. Stats., ch. 659, § 1. Moreover, pursuant to state authorization, the County ultimately increased the number of sitting judges from 9 to the current 10. 1987 Cal. Stats., ch. 1211, § 30; App. to Juris. Statement 81–82. Judicial elections took place under an at-large, countywide plan in 1986, 1988, and 1990.

The County, although covered by § 5 of the Act, failed to seek federal preclearance for any of its six consolidation ordinances. Nor did the State preclear its 1979 law that, like the County ordinance adopted the same year, directed the consolidation of the three municipal court districts. The State did seek the Attorney General's approval, however, for the 1983 state law authorizing additional judgeships upon the final merger of the justice courts into a single, countywide municipal court district. In the process, the State provided the Department of Justice with a copy of the County's 1983 consolidation ordinance. The Attorney General did not oppose the State's 1983 submission, and we have thus observed that this "submission may well have served to preclear the 1983 county ordinance." *Lopez* v. *Monterey County,* 519 U. S., at 15. We noted, however, that preclearance of the County's 1983 ordinance probably failed to satisfy the need to preclear the preceding consolidation ordinances, *ibid.* ("Thus, under our precedent, these previous consolidation ordinances do not appear to have received federal preclear-

ance approval"), and the State does not challenge this conclusion here, see Brief for Appellee State of California 13, n. 10.

## B

Appellants, Hispanic voters who reside in Monterey County, filed suit in the United States District Court for the Northern District of California on September 6, 1991, claiming that the County had failed to fulfill its §5 obligation to preclear any of the consolidation ordinances passed between 1972 and 1983. A three-judge District Court concluded that the ordinances were voting changes requiring preclearance under §5 and that the ordinances were unenforceable until they were precleared.

Accordingly, the County initiated proceedings before the United States District Court for the District of Columbia in an effort to preclear the ordinances. Ultimately, however, the County agreed to dismiss the suit without prejudice and to stipulate that its "'Board of Supervisors is unable to establish that the [consolidation ordinances] adopted by the County between 1968 and 1983 did not have the effect of denying the right to vote to Latinos in Monterey County due to the retrogressive effect several of these ordinances had on Latino voting strength in Monterey County.'" *Lopez* v. *Monterey County,* 871 F. Supp. 1254, 1256 (ND Cal. 1995) (quoting Monterey County Resolution 94–107 (Mar. 15, 1994)).

Back before the three-judge District Court in the Northern District of California, appellants and the County, working together, submitted alternatives to the districtwide voting scheme. Meanwhile, the State was allowed to intervene in the proceedings, and it opposed the proposed plans on the ground that they violated aspects of the California Constitution governing judicial elections. By late 1994, after unsuccessful attempts by the County to secure an amendment to the California Constitution, appellants and the County remained unable to formulate a judicial election

plan that they felt would comport with the requirements of the Voting Rights Act and that did not violate some aspect of state law. Under these circumstances, the District Court opted to put a voting scheme in place for purposes of a single election. See 871 F. Supp., at 1255–1256. The temporary plan, under which judges were elected from districts but served countywide, violated California constitutional provisions requiring that jurisdiction be coextensive with a judge's electoral base and prohibiting the division of cities among two or more municipal courts. See Cal. Const., Art. VI, §16(b); Art. VI, §5(a). The District Court concluded, however, that the single election would interfere only minimally with state interests. See 871 F. Supp., at 1259–1260.

The Attorney General precleared the court's interim plan in March 1995, and judges were selected in a 1995 special election to serve until January 1997. Following the election, however, this Court decided *Miller* v. *Johnson*, 515 U. S. 900 (1995), which, in the District Court's view, cast doubt on the legality of the interim plan. Having determined that other options were not feasible, the court thus ordered a new judicial election to be held in March 1996 under a countywide voting scheme, the very scheme that the County had effected through its consolidation ordinances and that appellants had challenged in their original complaint.

This Court granted appellants' emergency stay application and enjoined the proposed, countywide election. 516 U. S. 1104 (1996). We subsequently noted probable jurisdiction over the appeal, 517 U. S. 1118 (1996), and we reversed, *Lopez* v. *Monterey County*, 519 U. S. 9 (1996). The District Court had erred, we concluded, in directing an election to take place under a scheme that had not been precleared as required under §5. Accordingly, we remanded the matter to the District Court and directed that "[t]he requirement of federal scrutiny should be satisfied without further delay." *Id.*, at 25. In so doing, we expressly declined to pass on

the merits of a claim raised by the State that the current, countywide election scheme is not subject to § 5 preclearance because the scheme is now required by a combination of precleared law and *California* law. *Id.*, at 19–20. State law, under this view, does not require preclearance because it is not the product of a covered jurisdiction.

On remand, the State moved to dismiss appellants' complaint on this theory, among others, and the District Court agreed that preclearance was unnecessary because the countywide scheme was now mandated by California law. No. C–91–20559–RMW (ND Cal., Dec. 19, 1997), App. to Juris. Statement 1, 4–9. Among the other grounds for dismissal raised in its motion, the State also alleged that appellants' claims are barred by laches, that it was constitutional error to designate the County as a covered jurisdiction under § 5, and that the consolidation ordinances did not alter a voting "standard, practice, or procedure" subject to preclearance under § 5. The District Court did not address these alternative bases to dismiss appellants' complaint, however, and we do not reach them here. The State also moved to vacate a September 25, 1996, order extending the terms of the judges elected under the 1995 interim plan. The District Court granted this request along with the State's motion to dismiss.

In granting the motion to dismiss, the District Court reasoned that § 5, by its own terms, creates a preclearance obligation only for covered jurisdictions. Noncovered entities, like the State, bear no responsibility to preclear voting changes that they "enact or seek to administer." See *id.*, at 5. "[T]he purpose of § 5 appears to be to target only those enactments by jurisdictions suspected of abridging the right to vote and not those put in force by a non-covered, superior jurisdiction." *Ibid.*

Here, the District Court concluded, the 1979 state law had consolidated the three existing municipal courts and mandated that there be one municipal court district in the

County. This Act, in the court's view, did not require pre-clearance because it was the product of the State, a non-covered jurisdiction. The only additional change—effected by the County's 1983 ordinance merging the remaining justice court districts with the municipal court district—had been precleared. Moreover, the court reasoned, even if the 1983 ordinance had not received preclearance, an amendment to the California Constitution effective January 1, 1995, eliminated justice courts, and thus the remaining two justice court districts would have merged with the municipal court district as a matter of course. See Cal. Const., Art. VI, § 5(b). The justice court districts would have been unable to become municipal court districts themselves, the District Court reasoned, in light of a state constitutional provision requiring a minimum of 40,000 residents in a municipal court district. App. to Juris. Statement 8; see Cal. Const., Art. VI, § 5(a). In reaching its conclusion, the court expressly rejected appellants' claim that even voting changes effected by California law require preclearance before the County may "seek to administer" them. Relying on our decision in *Young* v. *Fordice*, 520 U. S. 273 (1997), the District Court concluded that a jurisdiction "'seek[s] to administer'" a voting change, as that language is used in § 5, only where the jurisdiction exercises some element of discretion or policy choice in the matter. App. to Juris. Statement 8–9. Here, the court found, the County had no choice but to implement the countywide voting scheme.

We noted probable jurisdiction over the appeal from the order dismissing appellants' complaint, 523 U. S. 1093 (1998), and we reverse.

## II

### A

Appellants and the County together contend that the County must obtain preclearance for changes leading to the countywide voting scheme before giving effect to this

scheme. The State urges, in response, that §5 expressly limits its preclearance requirements to covered jurisdictions. "Partially covered" jurisdictions like California, the State insists, are under no obligation to comply with §5. Appellants do not argue, however, that the State is obligated to seek preclearance for voting changes that it effects. Rather, appellants claim that the County, which is unquestionably subject to §5, must pursue preclearance for state-sponsored voting changes that it "seek[s] to administer." That the non-precleared aspects of the countywide voting plan may now be required by state law, in appellants' view, is irrelevant to the §5 analysis because it is the County that "seek[s] to administer" the scheme. Accordingly, the question before this Court is whether a covered jurisdiction "seek[s] to administer" a voting change when, without exercising any independent discretion, the jurisdiction implements a change required by the superior law of a noncovered State. Because we agree with appellants that a covered jurisdiction "seek[s] to administer" a voting change even where the jurisdiction exercises no discretion in giving effect to a state-mandated change, we conclude that the County is required to seek preclearance before implementing California laws that effect voting changes in the County.

The face of the Act itself provides the most compelling support for appellants' claim. The phrase "seek to administer" provides no indication that Congress intended to limit §5's preclearance obligations to the discretionary actions of covered jurisdictions. To the contrary, "administer" is consistently defined in purely nondiscretionary terms. See, e. g., Webster's Third New International Dictionary 27 (1961) ("to manage the affairs of," "to direct or superintend the execution, use, or conduct of"); Random House Dictionary of the English Language 26 (2d ed. 1987) ("to manage (affairs, a government, etc.); have executive charge of"); Black's Law Dictionary 44 (6th ed. 1990) ("To manage or conduct"). The State's view that "administer" is intended to capture a cov-

ered jurisdiction's nonlegislative, executive initiatives is not to the contrary. Such a reading poses no barrier to the view that "administer" also encompasses nondiscretionary acts by covered jurisdictions endeavoring to comply with the superior law of the State.

Nor are we persuaded that Congress' use of the word "seek" is intended to require an act of discretion by the covered jurisdiction in order to trigger the preclearance requirement. The word "seek" in this context is more readily understood as creating a temporal distinction. The Government has indicated that a covered jurisdiction need not seek preclearance before *enacting* legislation that would effect a voting change. See 28 CFR §51.22(a) (1997) (listing "[a]ny proposal for a change affecting voting submitted prior to final enactment" among "premature submissions" that Attorney General will not consider); see also Tr. of Oral Arg. 20. Preclearance is required before actually *administering* a change, however, and use of the word "seek" in §5 makes this distinction clear.

We note, too, that this Court has elsewhere assumed that legislation from a partially covered State must be precleared to the extent that it affects covered counties. In *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144 (1977), we rejected a constitutional challenge brought by Hasidic residents of Kings County, New York, to a redistricting plan enacted by the state legislature. We assumed in that case that the state plan was subject to the Act's preclearance requirements, even though the State was not a covered jurisdiction, because Kings and other counties were themselves covered by the Act. We observed that, after the State's efforts to exempt its counties from the Act's coverage proved unsuccessful, see *New York ex rel. New York County* v. *United States*, 419 U. S. 888 (1974), "it became necessary for New York [State] to secure the approval of the Attorney General or of the United States District Court for the District of Columbia for its 1972 reapportion-

ment statute insofar as that statute concerned [the covered] Counties," 430 U. S., at 148–149. Moreover, the decision's constitutional analysis relies on the fact that the redistricting effort was meant to fulfill the State's obligations under the Act. *Id.*, at 162 ("[P]etitioners have not shown, or offered to prove, that New York did more than the Attorney General was authorized to require it to do . . ."); see also *Shaw* v. *Hunt*, 517 U. S. 899, 911–913 (1996) (evaluating whether partially covered State's § 5 obligations justified race-based districting without any consideration that State may not have been subject to preclearance requirement). These decisions reveal a clear assumption by this Court that § 5 preclearance is required where a noncovered State effects voting changes in covered counties.

Nor have we been alone in this assumption. The Department of Justice claims to have received more than 1,300 submissions seeking to preclear state laws from the seven States that are currently partially covered: California, Florida, Michigan, New Hampshire, New York, North Carolina, and South Dakota. Brief for United States as *Amicus Curiae* in Support of Juris. Statement 13, n. 3; see also 28 CFR pt. 51, App. (1997) (identifying partially covered States); see generally *Perkins* v. *Matthews*, 400 U. S. 379, 392 (1971) (noting that a particular interpretation of § 5 "was accepted by at least some affected States and political subdivisions, which had submitted such changes for the Attorney General's approval"). In fact, cases before this and other federal courts reveal numerous instances in which interested parties have labored under the assumption that laws enacted by partially covered States require preclearance before they take effect in covered jurisdictions. See, *e. g.*, *Shaw* v. *Reno*, 509 U. S. 630, 634 (1993) ("Because the [North Carolina] General Assembly's reapportionment plan affected the covered counties, the parties agree that § 5 applied"); *Johnson* v. *De Grandy*, 512 U. S. 997, 1001, n. 2 (1994) (Florida submitted statewide redistricting law for preclearance because five

counties are covered); *Haith* v. *Martin*, 618 F. Supp. 410 (EDNC 1985) (suit over need to preclear North Carolina laws affecting covered jurisdictions without any claim by State that, as a noncovered jurisdiction, its laws are not subject to §5), summarily aff'd, 477 U. S. 901 (1986); *United States* v. *Onslow County*, 683 F. Supp. 1021, 1024 (EDNC 1988) (covered North Carolina county submitted changes for preclearance, including change required by state statute, and court concluded that change required §5 preclearance). While this Court is not bound by its prior assumptions, see, *e. g.*, *Brecht* v. *Abrahamson*, 507 U. S. 619, 630–631 (1993), the fact that courts and parties alike have routinely assumed a need for preclearance under the circumstances presented here supports our reading of §5.

Finally, we find it especially relevant that the Attorney General also reads §5 as we do. According to the Government: "The Attorney General has consistently construed Section 5 to require preclearance when a covered political subdivision 'seek[s] to administer' an enactment of a partially covered State." Brief for United States as *Amicus Curiae* 19; see also S. Rep. No. 97–417, pp. 11–12 (1982) (describing Attorney General's objections to laws enacted by North Carolina and South Dakota, both partially covered States). Subject to certain limitations not implicated here, see, *e. g.*, *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 508–509 (1992), we traditionally afford substantial deference to the Attorney General's interpretation of §5 in light of her "central role . . . in formulating and implementing" that section. *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32, 39 (1978); see, *e. g.*, *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166, 178–179 (1985) ("Any doubt that these changes are covered by §5 is resolved by the construction placed upon the Act by the Attorney General, which is entitled to considerable deference"); *Perkins* v. *Matthews*, *supra*, at 390–391 ("Our conclusion that both the location of the polling places and municipal boundary changes come

within § 5 draws further support from the interpretation followed by the Attorney General in his administration of the statute"). The Attorney General's interpretation thus provides significant additional support for our reading of § 5.

In light of the section's plain language and the Attorney General's interpretation to the same effect, we conclude that § 5's preclearance requirement applies to a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction. Accordingly, we need not reach appellants' alternative claim that the countywide district is in fact the product of the County's discretion.

### B

The State also urges that requiring preclearance here would tread on rights constitutionally reserved to the States. The State contends, specifically, that § 5 could not withstand constitutional scrutiny if it were interpreted to apply to voting measures enacted by States that have not been designated as historical wrongdoers in the voting rights sphere. In the State's view, because California has not been designated as a covered jurisdiction, its laws are not subject to § 5 preclearance.

We have recognized that the Act, which authorizes federal intrusion into sensitive areas of state and local policymaking, imposes substantial "federalism costs." *Miller* v. *Johnson*, 515 U. S., at 926. The Act was passed pursuant to Congress' authority under the Fifteenth Amendment, however, and we have likewise acknowledged that the Reconstruction Amendments by their nature contemplate some intrusion into areas traditionally reserved to the States. *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980). As the Court recently observed with respect to Congress' power to legislate under the Fourteenth Amendment, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in

the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." *City of Boerne* v. *Flores,* 521 U. S. 507, 518 (1997) (internal quotation marks and citation omitted).

Moreover, we have specifically upheld the constitutionality of § 5 of the Act against a challenge that this provision usurps powers reserved to the States. See *South Carolina* v. *Katzenbach,* 383 U. S. 301, 334–335 (1966); see also *City of Rome* v. *United States, supra,* at 178–183. Nor does *Katzenbach* require a different result where, as here, § 5 is held to cover acts initiated by noncovered States. The Court in *Katzenbach* recognized that, once a jurisdiction has been designated, the Act may guard against both discriminatory animus and the potentially harmful *effect* of neutral laws in that jurisdiction. 383 U. S., at 333–334. In *City of Rome,* we thus expressly reaffirmed that, "under the Fifteenth Amendment, Congress may prohibit voting practices that have only a discriminatory effect." 446 U. S., at 175; see also *id.,* at 178–180 (upholding preclearance requirement against federalism challenge).

This is, moreover, precisely what the text of § 5 requires. The United States District Court for the District of Columbia may preclear a proposed voting change only if the court concludes that the change "does not have the purpose *and will not have the effect* of denying or abridging the right to vote" on the basis of an impermissible classification. 42 U. S. C. § 1973c (emphasis added). The Attorney General employs the same standard in deciding whether to object to a proposed voting change. See 28 CFR § 51.52(a) (1997).

Recognizing that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions, we find no merit in the claim that Congress lacks Fifteenth Amendment authority to require federal approval before the implementation of a state law that may

have just such an effect in a covered county. Section 5, as we interpret it today, burdens state law only to the extent that that law affects voting in jurisdictions properly designated for coverage. With respect to literacy tests, in fact, the Act already allows for the very action that the State claims would be unconstitutional here. At least until a 1970 amendment to the Act barring literacy tests nationwide, see 42 U. S. C. § 1973aa, § 4 had been used to ban these tests in covered jurisdictions even where the tests had been enacted by a noncovered State. See *Gaston County* v. *United States*, 395 U. S. 285, 287 (1969) (although State was not covered, "[u]se of the State's literacy test within the county was . . . suspended" when the county was designated a covered jurisdiction). Moreover, under § 4(b), a state-imposed literacy test may, as it did here, provide grounds for designating a county as a covered jurisdiction, notwithstanding the fact that the State as a whole is not covered.

The State seeks to bolster its constitutional argument by noting that partially covered States, like California, have no statutory ability to seek an exemption from the Act's coverage. Section 4(a) permits a covered jurisdiction to seek declaratory relief exempting the jurisdiction from further coverage if it meets certain criteria. 42 U. S. C. § 1973b(a). Even if California were unable to use this "bailout" provision on behalf of its covered counties, but see *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S., at 148–149, n. 3 (noting that New York State sought exemptions on behalf of covered counties), this would not advance the State's constitutional claim. Partially covered States facing suspension of their literacy tests in covered counties would have faced the same dilemma. In any event, there is no question that the County may avail itself of § 4(a)'s bailout procedures.

In short, the Voting Rights Act, by its nature, intrudes on state sovereignty. The Fifteenth Amendment permits this

intrusion, however, and our holding today adds nothing of constitutional moment to the burdens that the Act imposes.

The State also urges that certain of our prior decisions require a covered jurisdiction to exercise some discretion or policy choice in order to trigger § 5's preclearance requirements. In particular, the State relies on *Young* v. *Fordice*, 520 U. S. 273 (1997), and *City of Monroe* v. *United States*, 522 U. S. 34 (1997) *(per curiam)*. The State, however, seeks to place more weight on these cases than they will bear. The State relies foremost upon *Young*, which involved a § 5 challenge to a covered State's efforts to comply with voting changes mandated by the National Voters' Registration Act. We concluded that changes brought about by efforts at compliance were themselves the result of discretionary decisions by the State, and these changes required § 5 preclearance: "This Court has made clear that minor, as well as major, changes require preclearance. This is true even where, as here, the changes are made in an effort to comply with federal law, so long as those changes reflect policy choices made by state or local officials." 520 U. S., at 284 (citations omitted). Like the District Court, the State seeks to invoke *Young* for the proposition that only the "policy choices" of *covered jurisdictions* are subject to the preclearance requirements. *Young,* however, involved an effort to comply with an Act of Congress, the very body that enacted the Voting Rights Act. Congress retains the authority to curtail the Act's protections with subsequent legislation; alternatively, Congress may be assumed to have accounted for the policies underlying the Act in rendering new law. Accordingly, the requirement that only "policy choices . . . by state and local officials" would trigger the § 5 requirements in *Young* served merely to isolate for preclearance those changes that are not wholly creatures of *Congress.*

The State also seeks to rely on *City of Monroe,* in which we held that preclearance of a voting change included in a statewide law empowered a municipality to implement that

change, notwithstanding the city's failure to preclear a change in its charter to the same effect. It is true that, in *City of Monroe*, the municipality was permitted to give effect to the statewide law without any need to preclear its effect at the city level. A second preclearance would have been wholly unnecessary, however. The Attorney General had already approved the change. 522 U. S., at 37 ("Since the Attorney General precleared [the statewide law], Monroe may implement it"). Accordingly, *City of Monroe* does not stand for the proposition that covered jurisdictions are generally permitted to engage in the discretionless implementation of state laws without seeking preclearance. The very change that the city of Monroe wished to enforce had already been precleared.

Finally, we note that this Court has created an exception to the preclearance requirement in certain cases involving federally court-ordered voting changes. As a general rule, voting changes crafted wholly by a federal district court in the first instance do not require preclearance. See *Connor* v. *Johnson*, 402 U. S. 690, 691 (1971) *(per curiam)*. Thus, in *Connor*, the Court rejected a claim that § 5 required preclearance of an electoral apportionment scheme developed and ordered by a Federal District Court in the course of litigation over the constitutionality of a Mississippi voting plan. *Ibid.* This narrow exception to the preclearance requirement, however, is not grounded in the fact that a voting change is mandated by a noncovered entity, without room for discretion on the part of a covered jurisdiction. Rather, the exception grows largely from separation-of-powers concerns arising where a voting measure is the product of a federal court, specifically. As Justice Black noted in his dissent in *Connor*:

> "Needless to say I completely agree with the holding of the majority that a reapportionment plan formulated and ordered by a federal district court need

not be approved by the United States Attorney General or the United States District Court for the District of Columbia. Under our constitutional system it would be strange indeed to construe § 5 ... to require that actions of a federal court be stayed and reviewed by the Attorney General or the United States District Court for the District of Columbia." *Id.*, at 695.

We have since recognized limitations on the *Connor* exception. In *McDaniel* v. *Sanchez*, 452 U. S. 130 (1981), the District Court had sustained a constitutional challenge to a county apportionment scheme and had ordered the implementation of a new plan that the county had submitted to the court. In holding that the new plan should have been precleared before the District Court took any action on it, we noted that § 5 "requires that whenever a covered jurisdiction submits [to a district court] a proposal reflecting the policy choices of the elected representatives of the people ... the preclearance requirement of the Voting Rights Act is applicable." *Id.*, at 153. Nor does this requirement that there be some "policy choic[e]" by the local jurisdiction represent a general rule that a covered jurisdiction must exercise discretion to trigger the § 5 preclearance obligations. *McDaniel* may best be read merely as an effort to isolate and protect wholly court-developed plans from preclearance. In any event, *McDaniel* applies only to voting changes embodied in federal-court orders, and we need not further define the scope of its exception to the *Connor* rule here.

We hold that the County is obligated to seek preclearance under § 5 before giving effect to voting changes required by state law. Accordingly, the judgment of the United States District Court for the Northern District of California is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

I would not decide in this case whether "§ 5's preclearance requirement applies to a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction." *Ante,* at 282. I think it quite possible, particularly in light of the constitutional concerns identified by JUSTICE THOMAS, that the phrase "seek to administer" in the statute requires that the covered jurisdiction exercise discretion or pursue its own policy aims before the obligation to preclear a voting change arises. See 14 Oxford English Dictionary 877 (2d ed. 1989) (defining "seek," *inter alia,* as "[t]o make it one's aim, to try or attempt *to* (do something)"). That interpretation draws some support from our decisions in *Connor* v. *Johnson,* 402 U. S. 690 (1971) *(per curiam),* and *Young* v. *Fordice,* 520 U. S. 273 (1997), which suggest that covered jurisdictions need not seek preclearance when a noncovered entity requires them to implement specific voting changes. See *Connor* v. *Johnson, supra,* at 691 (holding that covered jurisdictions need not preclear voting changes ordered by a federal court); *Young* v. *Fordice, supra,* at 290 (noting that a State's adoption of the National Voter Registration Act's registration system "is not, by itself, a change for the purposes of § 5, for the State has no choice but to do so").

I concur in the majority's disposition of this case, however, because it is clear that the state enactments requiring the voting changes at issue in fact embodied the policy preferences and determinations of the county itself. See *McDaniel* v. *Sanchez,* 452 U. S. 130, 148–151 (1981) (voting changes contained in federal-court order require preclearance if they were proposed by the covered jurisdiction); *Young* v. *Fordice, supra,* at 285 (state changes made in an effort to comply with federal law require preclearance if they "reflect the

exercise of policy choice and discretion by [state] officials"). For example, the 1979 state law which codified the county's merger of its municipal court districts stated on its face that it was enacted at the county's behest. 1979 Cal. Stats., ch. 694, §4 ("[T]his act is in accordance with the request of a local governmental entity or entities which desired legislative authority to carry out the program specified in this act"). In these circumstances, the county was required to seek preclearance of the voting changes codified by the state enactments.

JUSTICE THOMAS, dissenting.

The majority today interprets the phrase "seek to administer" as used in §5 of the Voting Rights Act of 1965, 42 U. S. C. §1973c, to require that a covered political subdivision seek federal approval of any law enacted by a noncovered State that effects a change with respect to voting in the covered political subdivision, so long as the covered political subdivision somehow implements the State's law. I do not think the majority's is the best reading of the statute; moreover, I think the majority's interpretation is constitutionally doubtful. I would read §5 to require preclearance only of those voting changes that are the direct product of a covered jurisdiction's policy choices. Accordingly, I respectfully dissent.

I

As the majority notes, *ante*, at 269, Monterey County (County) is a covered jurisdiction under the Voting Rights Act, but the State of California is not. Section 5 of the Voting Rights Act provides that whenever a covered "State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" that differs from those in effect on the date that the State or subdivision became a covered jurisdiction, it must obtain

federal approval of the new voting requirement.[1]  Although the County elected its municipal judges from separate districts at the time it became subject to the Act's preclearance requirement, California law now requires that the County elect its judges from a single judicial district.   This appeal, then, squarely puts before us for the first time the question whether § 5 requires federal preclearance of a noncovered State's laws effecting a change with respect to voting in one of its covered political subdivisions.

The majority concludes that the County must preclear the State's laws because it "seek[s] to administer" the state districting scheme.  *Ante*, at 278.[2]  The Voting Rights Act does not define the phrase "seek to administer," and the majority's construction of the phrase is not plainly erroneous. "[A]dminister" can plausibly be read, in isolation, to encompass "nondiscretionary acts by covered jurisdictions endeavoring to comply with the superior law of the State."  *Ante*, at 279.   But I do not think that the majority's reading of the statute is the best one.   "[S]eek to administer" must be read in light of its surrounding terms.   Section 5 requires that a covered political subdivision obtain federal preclearance whenever it "shall enact or seek to administer" voting changes.   The term "administer" is best understood when read in contrast to "enact."   In my view, Congress intended "administer" to reach those changes in voting qualifications, prerequisites, standards, practices, or procedures that a covered jurisdiction imposes in a way other than formal enactment.   In other words, the statute is designed to ensure that

---

[1] For convenience, I use the shorthand "voting change" or "change with respect to voting" throughout.   But I adhere to my view that not all changes affecting voting are covered by §§ 2 and 5 of the Voting Rights Act, as those sections are properly understood.   See *Holder* v. *Hall*, 512 U. S. 874, 891, 893–903 (1994) (opinion concurring in judgment).

[2] Even were I to agree with the majority's interpretation of the statute, I am not convinced that the County implements the State's districting laws simply by administering elections, as the majority apparently believes.

a covered jurisdiction cannot cleverly avoid preclearance requirements by the simple expedient of making voting changes by nonlegislative means.

The majority's interpretation appears to render superfluous the "enact" prong of the statute. A person could not be "denied the right to vote for failure to comply with" a covered jurisdiction's enactment affecting voting, as § 5 prohibits absent federal preclearance, unless the jurisdiction was administering its enacted laws. And the majority's explanation that "seek" as it modifies "to administer" is a "temporal distinction," *ante*, at 279, is unsatisfactory because it ignores that "shall" as it modifies "enact" is also a temporal limitation. Both prongs of the statute, not surprisingly, are written in terms of simple futurity, given § 5's prophylactic nature.

My interpretation of the statutory phrase also more accurately reflects the section's purpose. As we have previously recognized, § 5 was enacted as

> "'a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. . . . Congress therefore decided . . . "to shift the advantage of time and inertia from the perpetrators of the evil to its victi[m]," . . . .'" *Beer* v. *United States*, 425 U. S. 130, 140 (1976) (quoting H. R. Rep. No. 94–196, pp. 57–58 (1970)).

See also *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 477 (1997) (quoting *Beer*); *Miller* v. *Johnson*, 515 U. S. 900, 926 (1995) (same). It follows that Congress intended to subject to federal preclearance only the policy decisions made by jurisdictions that it found to be the "perpetrators of the evil" by means of the § 4(b) coverage formula that the majority describes, *ante*, at 269–270. California has never been found to satisfy the coverage test and therefore is not one of the "perpetrators" that § 5 is designed to thwart. I therefore

see no reason to believe that Congress intended § 5 to require federal approval of the State's policy choices.[3]

The Government, as *amicus curiae* supporting appellants, suggests that the State enacted its district consolidation legislation at the County's suggestion, implying that the state judicial district consolidation statutes are the product of the County's policy choices. Brief for United States as *Amicus Curiae* 22–25. I recognize that in *McDaniel* v. *Sanchez,* 452 U. S. 130 (1981), we required preclearance of a court-ordered voting change in a covered jurisdiction because the plan that the court had ordered was submitted by, and reflected the policy choices of, that covered jurisdiction, even though we had decided, in *Connor* v. *Johnson,* 402 U. S. 690 (1971) *(per curiam),* that federal court-ordered voting changes need not be precleared. 452 U. S., at 147, 153. We stated that "[a]s we construe the congressional mandate, it requires that whenever a covered jurisdiction submits a proposal reflecting the policy choices of the elected representatives of the people . . . the preclearance requirement of the Voting

---

[3] I recognize that we have interpreted § 5 to reach entities that did not obviously fall within the definition of covered "State or political subdivision" in prior cases. For example, in *United States* v. *Sheffield Bd. of Comm'rs,* 435 U. S. 110 (1978), we held that although the city of Sheffield, Alabama, was not a "political subdivision" under the Act, it was nevertheless subject to § 5's preclearance requirements because it was a "political unit" of the covered State. *Id.,* at 127–128. Whether *Sheffield* was correct as an original matter, the "top-down" approach to coverage that it announced is simply not implicated in this case; appellants argue for a "bottom-up" approach to coverage questions that I do not believe the reasoning of *Sheffield* supports. And in *Morse* v. *Republican Party of Va.,* 517 U. S. 186 (1996), the judgment of the Court was that § 5 could be extended to reach the activities of political parties in covered States. I adhere to the views that I expressed in dissent, but at most, that case stands for the proposition that for purposes of § 5 preclearance, "State" in some (but not all) instances is "coextensive with the constitutional doctrine of state action." *Id.,* at 265 (THOMAS, J., dissenting). Of course, this case requires us to interpret the phrase "seek to administer," not § 5's "State or political subdivision" language.

Rights Act is applicable." *Id.*, at 153. Although our holding in *McDaniel* is not obviously consistent with the text of §5 as I would interpret it, it at least appears to be consistent with the policy that we have said underlies §5. See *Beer, supra,* at 140. Regardless of whether the legislative product of a noncovered jurisdiction would ever be subject to the preclearance requirement if it could be demonstrated that a state law is a product of collusion between state and local governments, the record in this case does not support such a claim. And appellants did not make this argument, either in their complaint filed in the District Court[4] or in their briefs before this Court.

## II

Moreover, my reading of §5 avoids the majority's constitutionally doubtful interpretation. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909); see also *Feltner* v. *Columbia Pictures Television, Inc.,* 523 U. S. 340, 355, 356–359 (1998) (SCALIA, J., concurring in judgment).

Section 5 is a unique requirement that exacts significant federalism costs, as we have recognized on more than one occasion. See *Bossier Parish, supra,* at 480; *Miller* v. *Johnson, supra,* at 926; see also *City of Rome* v. *United States,* 446 U. S. 156, 200 (1980) (Powell, J., dissenting); *United States* v. *Sheffield Bd. of Comm'rs,* 435 U. S. 110, 141 (1978)

---

[4] For somewhat similar reasons, even if I agreed with the majority's interpretation of the statute, I would still affirm the District Court's dismissal of appellants' first amended complaint, which did not ask that the County be ordered to preclear the State's laws. The only coverage question the complaint raised was whether the County's antecedent consolidation ordinances needed to be precleared. App. to Juris. Statement 83–104.

(STEVENS, J., dissenting); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 358–360 (1966) (Black, J., concurring and dissenting). The section's interference with state sovereignty is quite drastic—covered States and political subdivisions may not give effect to their policy choices affecting voting without first obtaining the Federal Government's approval. As Justice Powell wrote in *City of Rome*, the section's "encroachment is especially troubling because it destroys local control of the means of self-government, one of the central values of our polity." 446 U. S., at 201.

Despite these serious and undeniable costs, we have twice upheld the preclearance requirement as a constitutional exercise of Congress' Fifteenth Amendment enforcement power,[5] first in *Katzenbach* and again in *City of Rome*. In those cases, we compared Congress' Fifteenth Amendment enforcement power to its broad authority under the Necessary and Proper Clause. See *City of Rome, supra,* at 175; *Katzenbach, supra,* at 326. But we have taken great care to emphasize that Congress' enforcement power is remedial in nature. See *City of Boerne* v. *Flores,* 521 U. S. 507, 516–529 (1997); *Katzenbach, supra,* at 327–328.[6]

There can be no remedy without a wrong. Essential to our holdings in *Katzenbach* and *City of Rome* was our conclusion that Congress was remedying the effects of prior *intentional* racial discrimination. In both cases, we required Congress to have some evidence that the jurisdiction bur-

---

[5] The Fifteenth Amendment provides:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

[6] Although *City of Boerne* involved the Fourteenth Amendment enforcement power, we have always treated the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive. See, *e. g., City of Boerne,* 521 U. S., at 518–528; *James* v. *Bowman,* 190 U. S. 127 (1903).

dened with preclearance obligations had actually engaged in such intentional discrimination. In *Katzenbach,* we recognized that Congress had "evidence of actual voting discrimination" in some jurisdictions. 383 U. S., at 330. In each of those jurisdictions, two characteristics were present—depressed voter turnout and the use of a test or device. We concluded that it was permissible for Congress to impose § 5 preclearance requirements on the States and political subdivisions for which Congress had "more fragmentary evidence" of voting discrimination, *id.,* at 329–330, where those two conditions (incorporated into the Act's coverage formula) could be found to exist, "at least in the absence of proof that [such jurisdictions] have been free of substantial voting discrimination in recent years," *id.,* at 330. We also thought it quite important that "the Act provide[d] for termination of special statutory coverage at the behest of States and political subdivisions in which the danger of substantial voting discrimination ha[d] not materialized during the preceding five years." *Id.,* at 331. In *City of Rome,* we rejected the city's argument that, because it had not employed any discriminatory practices over the relevant period, § 5 was unconstitutional as applied. We thought that "because electoral changes by jurisdictions *with a demonstrable history of intentional racial discrimination in voting* create the risk of purposeful discrimination, it was proper [for Congress] to prohibit changes that have a discriminatory impact." 446 U. S., at 177 (emphasis added; footnote omitted).

The majority "find[s] no merit in the claim that Congress lacks Fifteenth Amendment authority to require federal approval before the implementation of a state law that may have [a discriminatory] effect in a covered county." *Ante,* at 283–284. In my view, it overlooks our warning in *City of Boerne* that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." 521 U. S., at 530; see also *City of Rome, supra,* at 211–219 (REHNQUIST, J., dissenting). There has been no legislative finding

that the State of California has ever intentionally discriminated on the basis of race, color, or ethnicity with respect to voting. Nor has the State been found to run afoul of the Act's overbroad coverage formula. We recognized in *City of Boerne* that "[p]reventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." 521 U. S., at 532. But I do not see any reason to think that California's laws discriminate in any way against voting or that the State's laws will be anything but constitutional. I therefore doubt that § 5 can be extended to require preclearance of the State's enactments and remain consistent with the Constitution.

Moreover, it is plain that the majority's reading of § 5 raises to new levels the federalism costs that the statute imposes. If preclearance of a State's voting law is denied when sought by a covered political subdivision, the State will be unable to develop a consistent statewide voting policy; its laws will be enforceable in noncovered subdivisions, but not in the covered subdivision. And under the majority's reading of § 5, noncovered States are forced to rely upon their covered political subdivisions to defend their interests before the Federal Government. The subdivision may not know the State's interest, or may simply disagree with the State and therefore choose not to defend vigorously the State's policy choices before the Federal Government. Indeed, in this case, the County represented that it "concurs with the essential arguments of the Appellants that state law affecting voting, insofar as such law may affect elections within a covered jurisdiction, must be precleared . . . ." Brief for Appellee Monterey County 1.

The majority attempts to bolster its argument by suggesting that requiring the County to submit the State's laws for preclearance is no more unusual than the Act's suspension of literacy tests in covered jurisdictions. It points out that

in some instances, literacy tests were required by the laws of noncovered jurisdictions, including California. *Ante,* at 284. I do not think, however, that the suspension of tests and the preclearance remedy can be compared. The literacy test had a history as a "notorious means to deny and abridge voting rights on racial grounds." *Katzenbach, supra,* at 355 (Black, J., concurring and dissenting). Literacy tests were unfairly administered; whites were given easy questions, and blacks were given more difficult questions, such as "the number of bubbles in a soap bar, the news contained in a copy of the *Peking Daily,* the meaning of obscure passages in state constitutions, and the definition of terms such as *habeas corpus.*" A. Thernstrom, Whose Votes Count?, Affirmative Action and Minority Voting Rights 15 (1987). When we upheld the constitutionality of the suspension provision of the Voting Rights Act in *Katzenbach,* we indicated that the tests had actually been employed to disenfranchise black voters. 383 U. S., at 333–334. Later in *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), we upheld the national ban on the use of such tests—even though we recognized that they were not facially unconstitutional—as a proper means of preventing purposeful discrimination in the application of the tests and remedying prior constitutional violations by state and local governments in the education of minorities. Congress' suspension of tests, then, was a focused remedy directed at one particular prerequisite to voting. In contrast, the preclearance requirement presumes that a voting change—no matter how innocuous—is invalid, and prevents its enforcement until the Federal Government gives its approval.

*     *     *

I would interpret § 5 only to require preclearance of a covered jurisdiction's changes affecting voting qualifications, prerequisites, standards, practices, or procedures, whether made by formal enactment or otherwise. In my view, this

is the best interpretation of the statute and it avoids the grave constitutional concerns that the majority's contrary interpretation raises.   I respectfully dissent.