**Lyndon H. LAROUCHE, Jr., et al., Plaintiffs,**

v.

**Donald L. FOWLER, individually and as Chairman, Democratic National Committee, et al., Defendants.**

**No. CIV. A. 96–1816.**

United States District Court, District of Columbia.

Nov. 1, 1999.

Odin P. Anderson, Boston, MA, Nina Jean Ginsberg, Dimuro, Ginsberg & Lieberman, P.C., Alexandria, VA, Theo W. Mitchell, Greenville, SC, James E. Wilson, Jr., Montgomery, AL, James F. Schoener, Sarasota, FL, for plaintiffs.

John Christopher Keeney, Jr., Hogan & Hartson, L.L.P., Washington, DC, for Donald L. Fowler, Democratic National Committee, defendants.

H. Thomas Byron, III, Charles A. Rothfeld, Mayer, Brown & Platt, Washington, DC, for James L. Brady, Louisiana Democratic Party, Louisiana Democratic State Central Committee, defendants.

Jay B Myerson, Reston, VA, John Hardin Young, Falls Church, VA, for Sue Wrenn, Kenneth Geroe, Virginia Democratic Party, Virginia Democratic State Central State Committee, defendants.

Steven R. Ross, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, for William White, Texas Democratic Party, Texas State Democratic Executive Committee, Molly Beth Malcolm, defendants.

Howard M. Shapiro, Alex Emanuel Rogers, Wilmer, Cutler & Pickering, Washington, DC, John P. Frank, Lewis & Roca, L.L.P., Phoenix, AZ, for Sanuel G. Coppersmith, Arizona Democratic Party, Arizona State Democratic Committee, defendants.

Before SENTELLE, Circuit Judge, JACKSON, District Judge, and KENNEDY, District Judge.

## OPINION ON MOTION TO DISMISS

PER CURIAM.

This three-judge court was convened to consider a Voting Rights Act case arising out of Lyndon LaRouche's unsuccessful campaign to capture the Democratic Party's 1996 nomination for President of the United States. The suit was originally filed on August 2, 1996, and also contained additional constitutional claims. The application for a three-judge court was denied and the entire complaint dismissed pursuant to Fed.R.Civ.P. 12(b)(6). The court of appeals then affirmed in part and remanded in part, which required the assembly of a three-judge court on the claims under the Act. *See LaRouche v. Fowler,* 152 F.3d 974, 998 (D.C.Cir.1998). We now consider the remaining portions of defendants' motions to dismiss. We conclude that the defendant Democratic National Party is not a covered jurisdiction under the Act, and that the defendant state parties are not required to request preclearance of national party rules. We therefore grant the motion.

### I.

The focus of this action is on Democratic National Committee ("DNC") rules which essentially extinguished Lyndon LaRouche's chances of winning the Democratic presidential nomination in 1996. The facts are already detailed extensively in the opinion of the court of appeals. *See id.* at 975–77. We restate the relevant facts here.

LaRouche first announced his presidential bid on August 7, 1993. On March 12, 1994, the DNC adopted Delegate Selection Rules for their 1996 convention. Rule 11(K) stated:

> For purposes of these rules, a Democratic candidate for President must be registered to vote, must be a declared Democrat, and must, as determined by the Chairman of the Democratic National Committee, have established a bona fide record of public service, accomplishment, public writings and/or public statements affirmatively demonstrating that he or she has the interests, welfare and success of the Democratic Party of the United States at heart and will participate in the Convention in good faith.

The DNC also promulgated its "Call to the 1996 Democratic National Convention," in which Article IV defined a presidential candidate as:

> any person who, as determined by the National Chairperson of the Democratic National Committee, has accrued delegates in the nominating process and plans to seek the nomination, has established substantial support for his or her nomination as the Democratic candidate for the Office of the President of the United States, is a bona fide Democrat whose record of public service, accomplishment, public writings and/or public statements affirmatively demonstrates that he or she is faithful to the interests, welfare and success of the Democratic Party of the United States, and will participate in the Convention in good faith.

LaRouche qualified for a position on the Democratic party ballot in a number of states by the spring of 1996. But on January 5, 1996, DNC Chairman Donald L. Fowler sent a letter to the chairpersons of all state Democratic Party organizations. Under Rule 11(K) and Article IV (the "Rules"), Fowler stated in relevant part that LaRouche was "not a bona fide Democrat," as shown by his "beliefs which are explicitly racist and anti-Semitic, and otherwise utterly contrary to the fundamental beliefs ... of the Democratic Party ...." Thus, LaRouche was "not to be considered a qualified candidate," and "state parties ... should disregard any votes that might be cast for Mr. Larouche [sic], should not allocate delegate positions to Mr. Larouche and should not recognize the selection of delegates pledged to him at any stage of the Delegate Selection Process." The letter further stated that "Mr. Larouche will not be entitled to have his name placed in nomination for the office of President at the 1996 Democratic National Convention."

LaRouche was not excluded from any primary ballots as a result of this letter. But, he alleges that he received enough votes to receive representation in Democratic nominating activities in Louisiana, Virginia, Texas, and Arizona, and the District of Columbia. Due to the Fowler letter, however, each of these jurisdictions denied LaRouche such representation.

LaRouche and his supporters then filed this suit against Fowler, the DNC, and the state Democratic parties and various party officials of each of the above-mentioned states (the "state defendants"). He alleged that the Democratic Party nominating procedures which undermined his campaign had been adopted unlawfully because they were not precleared under the Voting Rights Act (the "Act"), 42 U.S.C. § 1973 *et seq.*, and also violated his Constitutional rights under 42 U.S.C. § 1983. He also requested the appointment of a three judge court.

The one-judge district court denied the application and dismissed the entire action. The court of appeals affirmed the dismissal of some claims. First, claims against the District of Columbia Democratic Party were dismissed because it is not a "covered jurisdiction" subject to preclearance under the Act. *See LaRouche,* 152 F.3d at 986. Second, the court of appeals affirmed the dismissal of LaRouche's § 1983 claims. *See id.* at 998.

The appeals court remanded the Voting Rights Act claims against Fowler, the DNC, and the state defendants. It noted that a single judge may dismiss claims under the Act only if the plaintiff's challenge is "wholly insubstantial" or "obviously frivolous." *Id.* at 982–83. Because the extent to which political party activities are subject to the Act is not clear after *Morse v. Republican Party,* 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996), and although that case might be distinguishable, the court was unable to say that the plaintiffs' claims failed to meet that standard. *Id.* at 986. Therefore, it remanded the cause to this three-judge court to consider the motion to dismiss.

## II.

Congress adopted the Voting Rights Act in 1965 to remedy racial discrimination in voting. *See South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Section 5 of the Act bars covered "state[s] or political subdivision[s]" from "enact[ing] or seek[ing] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" different from that in effect on November 1, 1964, or two specified later dates, unless they have been precleared with the Attorney General or approved by the United States District Court for the District of Columbia. 42 U.S.C. § 1973c (1994). "Vote" or "voting" is defined as "all action necessary to make a vote effective in any primary, special, or general election" for "candidates for public or party office." 42 U.S.C. § 1973*l*(c)(1) (1994). Under § 4 of the Act, the Attorney General is assigned the task of identifying covered jurisdictions; that is, each "State or ... political subdivision of a state" in which racial discrimination in voting has occurred. 42 U.S.C. § 1973b(b) (1994). The Justice Department's list includes the states at issue here. *See* 28 C.F.R. pt. 51, app. (1998). The list does not include the DNC.

## III. Application of "Delegation Theory" to the DNC

We first consider whether the Act can be construed to apply to Chairman Fowler and the DNC. We admit that the issue is not as clear cut as simply pointing out that the DNC is not listed as a covered jurisdiction. This is because in *Morse* the Court held that a political party, though not listed as a covered jurisdiction, can be subjected to the preclearance requirements of the Act.

■ In *Morse,* the Court ruled that the Virginia Republican Party was required to preclear the adoption of a party convention fee because the party was acting under power delegated by the state of Virginia, a covered jurisdiction. *See Morse,* 517 U.S. at 203, 116 S.Ct. 1186 (Stevens, J., announcing the judgment of the Court, joined by Ginsburg, J.). The Court's ruling produced no majority opinion, and is thus difficult to apply as binding precedent. Five opinions were delivered: Justice Stevens announced the judgment of the Court in an opinion joined by Justice Ginsburg, *see id.* at 190, 116 S.Ct. 1186; Justice Breyer concurred in the judgment in an opinion joined by Justices O'Connor and Souter, *see id.* at 235, 116 S.Ct. 1186; Justice Scalia filed a dissent joined by Justice Thomas, *see id.* at 241; Justice Kennedy filed a dissent joined by Chief Justice Rehnquist, *see id.* at 247, 116 S.Ct. 1186; Justice Thomas also filed a dissent joined by Chief Justice Rehnquist and Justice Scalia, and by Justice Kennedy in part, *see id.* at 253, 116 S.Ct. 1186. Despite this split of opinion, *Morse* is the primary case regarding the application of § 5 to political parties and we must consider its application not only to the DNC, but also to the state defendants which are discussed below. We do so mindful that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). This inquiry can be quite difficult, and "is workable ... only when one opinion is a logical subset of other, broader opinions." *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991) (en banc). This is not the case in *Morse.*

Justice Stevens declared in *Morse* that "political parties are covered under § 5 ... insofar as the Party exercises delegated power over the electoral process ...." 517 U.S. at 224, 116 S.Ct. 1186 (Stevens, J.). A state makes such a delegation when it automatically allows the nominees of the two major political parties to appear on

the general election ballot. *See id.* at 195–97, 116 S.Ct. 1186 (Stevens, J.). Justice Breyer, concurring in the judgment, thought it unlikely that Congress intended to exclude all political party activity in light of the history surrounding the Act. *See id.* at 235–37, 116 S.Ct. 1186 (Breyer, J.); *LaRouche,* 152 F.3d at 984. But he noted that the Court need not "decide just which party nominating convention practices fall within the scope of the Act." *Morse,* 517 U.S. at 238, 116 S.Ct. 1186 (Breyer, J.). The First Amendment right of association, he thought, was not sufficiently implicated by a convention fee, and such concerns could be left for a later day. *See id.* at 239–40, 116 S.Ct. 1186 (Breyer, J.). Justice Stevens also agreed that the First Amendment did not prevent enforcement of § 5 under the facts. *See id.* at 228–29, 116 S.Ct. 1186 (Stevens, J.). Thus, while the two opinions share common elements, it is not apparent that one fits neatly into the other, so as to provide clear guidance as to the "narrower" holding of the court. Therefore, lower courts are left without clear instruction.

■ Based on the undefined contours of the delegation of state power theory followed by *Morse,* the court of appeals left to our consideration whether, under *Morse,* the preclearance obligation of the statute extended to the DNC and its internal party rules. *See LaRouche,* 152 F.3d at 986. It could be argued that the DNC has received the delegated authority of covered jurisdictions by the states' allowing major party candidates to automatically appear on the general election ballot. However, we hold that the theory of delegation used in *Morse* does not extend that far.

A recent Court decision handed down after the court of appeals remand guides us. *See Lopez v. Monterey County,* 525 U.S. 266, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999). In *Lopez,* Monterey County, California, was sued for a failure to preclear election changes mandated by California law. Although Monterey County is a cov-

ered jurisdiction, the state of California is not. *See id.* at 696. Thus, the issue presented was "whether a covered jurisdiction 'seek[s] to administer' a voting change when, without exercising any independent discretion, the jurisdiction implements a change required by the superior law of a noncovered State." *Id.* at 701. The Court answered that question in the affirmative and held that Monterey County was required to seek preclearance to administer the election changes. *See id.* at 705.

While not directly on point, the reasoning of *Lopez* is helpful here. The DNC is not a covered jurisdiction. But regardless of whether the state parties are covered, the DNC need not preclear changes for the same reason that California does not need to preclear changes, i.e., neither California nor the DNC are covered jurisdictions, although their political subunits may be. *Morse* may stand for the proposition that a state political party can at times act as a delegatee of power from its resident state, but it would be inconsistent with *Lopez* to say that a national political party can be delegatee of power from any of its covered political subunits.

Although each state may, in a manner of speaking, "delegate" authority to a national party by allowing its candidate automatic ballot access, the national party does not act solely pursuant to that delegation. The DNC's decisions affect the Democratic Party in all states. No one state controls the method in which the Democratic Party chooses candidates. *Cf. Cousins v. Wigoda,* 419 U.S. 477, 490, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (agreeing that it would be "an obviously intolerable result" if each of the fifty states could establish delegate qualifications without regard to national party policies) (quoting *Wigoda v. Cousins,* 342 F.Supp. 82, 86 (N.D.Ill.1972)). For example, if the Democratic Party of Maine, an uncovered jurisdiction, adopts a voting qualification, it need not apply for preclearance. Yet, the Maine party's ability to do this by implementing a national rule would be curtailed if the DNC is a covered

jurisdiction. This is so because if the DNC had to preclear all changes that it wants all state parties to follow, even in uncovered jurisdictions, the consequence is that all state Democratic parties are affected—a result inconsistent with *Lopez.* There has never been a suggestion in *Lopez* or any other decision that any state with covered political subdivisions must preclear all changes; instead, only covered jurisdictions must apply in order to implement changes.

Furthermore, the statute itself defines its coverage in terms of states and political subdivisions of states. If we divorce coverage from geographical considerations, a political entity could not readily determine whether to apply for preclearance. As in *Lopez,* it is logical to require preclearance of the organization that is resident in the covered jurisdiction, but absolve the parent entity. Covered jurisdictions remain covered, and uncovered ones remain uncovered consistent with general application of § 5. In *United States v. Board of Commissioners of Sheffield, Alabama,* 435 U.S. 110, 120, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), the Supreme Court recognized that § 4(a) of the Act "appl[ies] throughout each designated jurisdiction," reasoning that "[s]ince the States or political subdivisions 'with respect to which' § 4(a)'s duties apply are entire territories . . ., § 5 must, it would seem, apply territorially as well." *Id.* at 126, 98 S.Ct. 965. Even so, today we conclude that application of the preclearance requirement to a national political party is not consistent with the geographic scheme of the statute.

Therefore, we hold that the DNC is not a covered jurisdiction. Its internal party rules are not subject to preclearance under the Act and applicable Justice Department regulations.

### IV. State Parties

#### A. Personal Jurisdiction and Venue

Before deciding whether the preclearance requirements apply to the state defendants, we briefly address their contentions that this court lacks personal jurisdiction over them and that venue is improper.

To assert personal jurisdiction over a nonresident defendant, a federal court must satisfy the Due Process Clause of the Fifth Amendment. *See, e.g., Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). We need not conduct a separate inquiry under the long-arm statute of the District of Columbia because, for our purposes here, that statute extends to the same constitutional limits. *See United States v. Ferrara,* 54 F.3d 825, 828 (D.C.Cir.1995); *Hummel v. Koehler,* 458 A.2d 1187, 1190 (D.C.1983). Accordingly, we look for "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations and internal quotes omitted). We also inquire as to whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Here, LaRouche alleges that the DNC conspired and acted in concert with the state defendants in violation of the Voting Rights Act. These actions, many of which are alleged to have occurred in the District of Columbia, resulted in the issuance and administration of the Rules which were used to defeat LaRouche's candidacy. The complaint also mentions or alludes to numerous contacts between the state defendants and the District of Columbia regarding events at issue in this case. The defendant's dispute on this issue amount to little more than a plaintive plea that the complaint is inartfully drawn. We find that this court has personal jurisdiction over the state defendants.

■ The defendant's improper venue claim may also be disposed of. It is true that the Voting Rights Act venue provision only applies to states and their subdivisions, *see* 42 U.S.C. § 1973(c) (1994), but that is not the only statute we look to. The complaint makes allegations which satisfy the general venue provisions of 28 U.S.C. § 1391(b) (1994). For example, the fact that the defendant DNC is a resident of the District of Columbia makes venue in this court proper.

## B. Right of Association Limitations

■ We must now ask whether the state parties were required to seek preclearance before administering the DNC rules. Perhaps there is some support for an affirmative answer in *Morse* and *Lopez*. As in *Morse*, we are dealing with state political parties that receive some delegated authority from their respective states. *See LaRouche*, 152 F.3d at 985. And although the state parties did not promulgate the rules at issue, the administration of such rules arguably could require preclearance under *Lopez*. Thus, the issue becomes whether the rules at issue here are of the type that the Supreme Court intended to cover in *Morse*. In holding the DNC not to be a covered jurisdiction above, we did not need to determine which party practices were subject to preclearance. *Morse*, however, did rule that some state parties practices, such as the fee requirement in *Morse* itself, can be subject to preclearance by state parties resident in covered jurisdictions. We must consider now "which party nominating convention practices fall within the scope of the Act." *Morse*, 517 U.S. at 238, 116 S.Ct. 1186 (Breyer, J.).

■ One of the few guideposts that *Morse* provides for us in this determination is that associational rights must be considered. Indeed, all nine justices in *Morse* recognized that the First Amendment right of association is implicated by the application of the Act to political parties. Justice Stevens, announcing the deci-

sion, recognized that "the right of association of members of a political party 'is a basic constitutional freedom,'" but did not consider "hypothetical cases unrelated to the facts of this case [that] might implicate First Amendment concerns that would foreclose application of the preclearance requirement." *Id.* at 228, 116 S.Ct. 1186. Justice Breyer, in concurring, stated that the fee requirement "lies within the Act, and well outside the area of greatest 'associational' concern," but that First Amendment questions are "difficult ones," which "are properly left for a case that squarely presents them." *Id.* at 239, 116 S.Ct. 1186. Justice Scalia, in dissent, noted that the interpretation of the Act is "inextricably bound up" with "the First Amendment freedom of political association." *Id.* at 241, 116 S.Ct. 1186. Justice Kennedy argued that "[t]he First Amendment questions presented by governmental intrusion into political party functions are a further reason for caution before we adopt a blanket rule that preclearance is required on the theory that when Congress used the word 'State' it also meant 'political party.'" *Id.* at 250, 116 S.Ct. 1186. Justice Thomas, also dissenting, noted that "[s]evere interference with protected rights of political association 'may [only] be sustained if the [government] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms,'" and that "it is not equally obvious to me that § 5, as interpreted today, would survive a First Amendment challenge." *Id.* at 285, 116 S.Ct. 1186 (quoting *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Thus, while the five minority opinions of *Morse* differ as to the implication of the right of association on the facts of that case, all agree that application of the preclearance requirements to political party actions implicates those rights. We must now determine whether the more direct application sought by plaintiff in this case implicates those rights to an impermissible extent. It does.

The Supreme Court recognized First Amendment associational rights in political parties at least as early as *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952). In *Blair,* the Court considered an attempt by the state of Alabama to require a state party chairman to certify a candidate for presidential elector in the face of the candidate's refusal to pledge his support to the nominees of the national convention of that party for president and vice president of the United States. The Supreme Court reversed a state court decision upholding the state's power to require the certification, recognizing the right of a party's governing body to "protect[ ] a party from intrusion by those with adverse political principles." *Id.* at 221–22, 72 S.Ct. 654. Subsequently, in *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the High Court invalidated Ohio election laws imposing formidable hurdles to the formation of third parties declaring that Ohio had not stated a sufficient state interest to "justify the very severe restrictions on voting and associational rights which [it] ha[d] imposed." *Id.* at 32, 89 S.Ct. 5. Backing down the states' attempted imposition of stringent standards on the formation of the political party, the Court referred to the "immediate and crippling impact on the basic constitutional rights involved . . . ." *Id.* at 33, 89 S.Ct. 5.

In *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), the Court reviewed a state court order barring a national party from seating the delegates chosen by its local subunits and ordering the seating of delegates chosen under procedures governed by the state election code. In reversing the state court decision, the Supreme Court recognized that "the National Democratic Party and its adherents enjoy a constitutionally protected right of political association," not to be infringed by state interference, absent a compelling state interest. *Id.* at 487, 95 S.Ct. 541. Likewise, in *Democratic Party of the United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), the High Court consid-

ered the validity of a state supreme court decision holding that the National Democratic Party must recognize delegates chosen to its national convention through an open primary required by state statute rather than through a procedure mandated by the party's own delegate selection rules requiring a closed system in which "only those who are willing to affiliate publicly with the Democratic party may participate . . . ." *Id.* at 109, 101 S.Ct. 1010. In upholding the party's right to use its own selection methods, the Supreme Court recognized that "the freedom to associate for the common advancement of political beliefs necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Id.* at 122, 101 S.Ct. 1010 (internal quotation marks and citation omitted). Similarly, in *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), the state attempted to impose a closed primary system on a party desiring to open its primaries to independent voters. Again, the Court held that the restrictions "impermissibly burden[ed] the rights of the Party and its members protected by the First and Fourteenth Amendments." *Id.* at 229, 107 S.Ct. 544. The Court has subsequently hewed to the same line in cases raising various state restrictions on the associational rights of political parties. *See, e.g., Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 224–25, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (holding that California ban on primary endorsements "suffocates" freedom of association, and that laws regulating party governing bodies unjustifiably burden strong associational rights); *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 363, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (holding that Minnesota antifusion ballot provision does not severely burden a party's associational rights, although a party has a right to select its own candidate); *see also Duke v. Massey,* 87 F.3d 1226, 1234 (11th Cir.1996) ("The Re-

publican Party has a First Amendment right to freedom of association and an attendant right to identify those who constitute the party based on political beliefs.").

■ In short, the Supreme Court has consistently held that political party membership and governance implicate "core associational activities" constitutionally protected from government interference absent sufficient justification. *Timmons,* 520 U.S. at 360, 117 S.Ct. 1364. Here, we have the state parties administering internal national party rules governing who, as a Democrat, can be a candidate for president. This would appear to fall within the core associational rights of a political party. *See, e.g., Democratic Party of the United States,* 450 U.S. at 121–22 & n. 22, 101 S.Ct. 1010 (stating that the freedom to associate "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only") (citing Laurence Tribe, American Constitutional Law 791 (1978) ("Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.")); *see also LaRouche,* 152 F.3d at 996 ("[T]he Party's ability to define who is a 'bona fide Democrat' is nothing less than the Party's ability to define itself."). Indeed, Justice Breyer intimated in his opinion in *Morse* that party activities such as the adoption of resolutions or platforms regarding party philosophy and rules governing internal operation, "are very likely not subject to preclearance." *Morse,* 517 U.S. at 238, 116 S.Ct. 1186 (Breyer, J.) (citing *Presley v. Etowah County Comm'n,* 502 U.S. 491, 502–03, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992)).

■ Pitted against this core constitutional right is the Voting Rights Act preclearance requirement, intended to enforce the guarantees of the Fifteenth Amendment. In a normal case, § 5 can cover candidacy requirements and qualifications.

*See Presley,* 502 U.S. at 502, 112 S.Ct. 820 (citing *N.A.A.C.P. v. Hampton County Elections Comm'n,* 470 U.S. 166, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985); *Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Dougherty County Bd. of Ed. v. White,* 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978)). But while the Act is unarguably a statute of importance, *see, e.g., South Carolina v. Katzenbach,* 383 U.S. at 308–09, 86 S.Ct. 803, it should not be read to extend coverage that would interfere with core associational rights; specifically here, internal national party rules as followed by state parties in a covered jurisdiction.

■ In reaching this conclusion, we are guided by the principle that we should construe statutes so as to avoid constitutional questions. To hold as LaRouche seeks would unnecessarily implicate First Amendment rights. By holding that the preclearance requirement does not apply to the political party rules at issue here, we avoid the implication of the First Amendment rights of association. When faced with two constructions of a statute, it is "our plain duty to adopt that construction which will save the statute from constitutional infirmity." *United States ex. rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909); *see also Edward J. De-Bartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). The prevailing Justices in *Morse* did not find this rule of construction implicated on the facts of that case, but held that the practice challenged was "well outside the area of greatest 'associational' concern." *Morse,* 517 U.S. at 239, 116 S.Ct. 1186 (Breyer, J.). Here, however, we have a

core right before us. We must invoke the rule.

■ We point out that this case does not present the direct clash of a Fifteenth Amendment violation and a First Amendment right. LaRouche's constitutional claim under the Fifteenth Amendment was dismissed by the one-judge district court and affirmed by the court of appeals. *See LaRouche,* 152 F.3d at 987, 998. Thus, this case is not governed by the White Primary Cases, in which the Court struck down practices excluding minority voters from the Texas Democratic Party nomination process as violative of the Fifteenth and Fourteenth Amendments. *See Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). The history of the White Primary Cases supports the proposition that Congress intended the Voting Rights Act to have a broad scope, *see Morse,* 517 U.S. at 210–12, 116 S.Ct. 1186 (Stevens, J.), but we cannot "lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp.,* 485 U.S. at 575, 108 S.Ct. 1392. The Court of Appeals observed that nothing in the historical context of the Voting Rights Act evidences "a concern that a covered jurisdiction would to try achieve [unconstitutional] end[s] by delegating authority to a national party, or that a national party would attempt to impose racially discriminatory rules on a covered jurisdiction." *LaRouche,* 152 F.3d at 986. Although it may be true that "the right of associative freedom would not provide a defense to many practices condemned by § 5," *see Morse,* 517 U.S. at 229 n. 38, 116 S.Ct. 1186 (Stevens, J.), we only consider a national party rule concerning core associational freedoms formulated by an uncovered entity, which does not implicate suspect classifications, and which is administered without alteration by covered jurisdictions. Heeding Justice Breyer's concerns in *Morse,* we need not go further. *See Morse,* 517 U.S. at 238–40, 116 S.Ct. 1186 (Breyer, J.).

In the wake of *Morse,* we know that some "nominating convention practices" of political parties may fall within the Act's preclearance requirements. We also know that this inquiry is impacted by the associational rights at issue. The *Morse* Court did not need to determine the "hypothetical concerns" that later cases such as this one would raise, *id.* at 229, 116 S.Ct. 1186 (Stevens, J.), but we must confront the reach of the federal government into an area long recognized as involving the fundamental political rights of the nation's citizens. We hold that under the facts of this case, the First Amendment rights of the political party and its members preclude a reading of the preclearance requirements which would allow their application to the state defendants. The motion to dismiss is granted.

### ORDER

The motions to dismiss came on to be heard before a three-judge court of the United States District Court of the District of Columbia and was argued on August 16, 1999.

On consideration whereof, for the reasons set forth more fully in the opinion issued on even date, it is this 1st day of November, 1999, herewith

ORDERED that defendants' motion to dismiss is granted.