Barry CURTIS, Michael A. Claunch, and Brenda B. Neil, Plaintiffs,

v.

Marion A. "Bid" SMITH, in his official capacity as Tax Assessor–Collector for Polk County, Texas, Defendant.

No. Civ.A. 9:00–CV–241.

United States District Court, E.D. Texas, Lufkin Division.

Nov. 3, 2000.

Larry Parish York, Mary Frances Keller, Baker & Botts, Austin, TX, for plaintiffs.

Robert Thrane Bass, Allison Bass & Associates, Austin, TX, for defendant.

Randall B. Wood, Ray Wood & Fine, Austin, TX, for intervenors Howard Daniel Jr., Tiffany Jones, and Jerry Don Marsh.

## MEMORANDUM AND ORDER

COBB, District Judge.

Before the court is Plaintiffs' Motion for Preliminary Injunction, and the court having heard the witnesses and attorneys for the parties and having reviewed the motion and response thereto is of the opinion that the motion be GRANTED.

Plaintiffs seek in this action to prohibit defendant, Marion "Bid" Smith, from mailing confirmation letters to approximately 9,000 persons who are currently registered voters in Polk County, Texas. They are self-styled "Escapees," largely retirees, and apparently travel a major portion of each year in recreational vehicles (RV's). They purchased licenses for their vehicles in Polk County, Texas, and all claim their residence is in the Rainbow's End RV Park in Polk County. All have applied for and been registered by the appropriate county official to vote in that county.

I. Procedural history and background.

Rainbow's End is a parcel of land containing 130 acres south of Livingston, the county seat of Polk County, Texas. It does not have the ability to park 4500 or 9,000 RV's on its land at any one time. It probably can accommodate approximately 200–300 licensed RV's simultaneously in spaces with permanent services such as electricity and water.

Plaintiffs base their action on the requirements of 42 U.S.C. § 1973 *et. seq.*, titled the Voting Rights Act ("the Act"). Section 5 of the Act requires that any change in voting qualifications or prerequisites, or any standard, practice, or procedure within a covered state or subdivision of a state be precleared either by a declaratory judgment of the United States District Court for the District of Columbia or, alternatively, by submission to the Department of Justice ("DOJ"), which must respond to the submission within 60 days. The specific reason for such preclearance is to ensure that any such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c (§ 5 of the Act). Preclearance by submission to the DOJ is apparently the method preferred by states and their subdivisions. Under the terms of the Act, Texas and its subdivisions are covered by the Act and must preclear any voting related change not in effect as of November 1, 1972.

The present Texas Election Code, which was enacted originally in 1985 and became effective January 1, 1986, was submitted to the Department of Justice in 1984 for preclearance before the Texas Legislature was to meet in biennial session in 1985. This Code replaced the formerly existing Texas civil statutes governing elections. The codified changes were precleared by the DOJ in accordance with § 5 of the Voting Rights Act, prior to the 1985 enactment. There have been two other preclearances in 1994 (prior to the legislative session) and in 1995. The changes submitted were approved.

On September 11, 2000, in accordance with the provisions of the Texas Election Code (§ 16.0921), three resident voters filed affidavits which challenged the residency (and thus the voter-eligibility) of approximately 9,000 voters in Polk County. These affidavits triggered the action of the Tax Assessor–Collector (who by statute is the voter registrar in his county) in his sending confirmation notices to the Escapees.

The Texas Election Code provides only a single method to challenge a voter's residence. Section 16.0921 of the Election Code provides:

(a) On the filing of a sworn statement under Section 16.092 alleging a ground based on residence, the registrar shall promptly deliver to the voter whose registration is challenged a confirmation notice in accordance with Section 15.051.

(b) If the voter fails to submit a response to the registrar in accordance with Section 15.053, the registrar shall enter the voter's name on the suspense list.

The sworn statement, or affidavit, is required to be based on personal knowledge, and not merely on information and belief. The challenged voter's name must be stated in the affidavit as well as his address. The three affidavits at issue are identical in content, and attach the lists of registered voters as exhibits. One exhibit contains all Escapees claiming Rainbow's End as their permanent residence, and a much shorter list contains several hundred names of persons who have fixed, non-mobile homes in the two precincts (19 and 20) involved.

The voters claiming Rainbow's End residency receive their mail at a personal mail box (PMB) at a physical post office address at Rainbow's End. A Ms. Carr keeps current records of the names of the Escapees and where to forward mail to each person with a PMB.

The Texas Election Code requires the registrar to mail the confirmation notice to a voter whose residence is properly challenged. The notice includes a form confirming that the address on his or her voter registration certificate is correct, or, if not, his or her present place of permanent residency. In accordance with Texas Election Code § 15.053, the challenged voter must submit a written, signed response to the confirmation notice not later than the 30th day after the date the confirmation notice is mailed, or the voter is placed upon the suspense list for that pre-

cinct. No one in the suspense list can vote at the next ensuing election unless he or she confirms either in person or by returning by mail the form confirming his or her residence before the day of the election.

Thus, in practical terms if the Escapees are mailed confirmation notices at their PMB's and do not return them timely and properly stating their places of residence are correctly stated on their voter registration cards, their votes are not counted in the next election.

The next election after September 11, 2000, is the general election on November 7, 2000, both as to national, state, and local offices. Plaintiffs attorney, purporting to represent all 9,000 persons, claims that they may be disenfranchised.

The Attorney General of Texas, representing the state and its Secretary of State brought suit in state court seeking injunctive relief until such process and practice by the Polk County registrar who responded to this massive challenge was precleared by either a declaratory judgment of the United States District Court for the District of Columbia, or by review of the Attorney General of the United States. The state district court, after two hearings, granted a Temporary Restraining Order requested by the Secretary of State. But on application of the intervenors herein (the three individuals who originally filed the affidavits challenging the Escapees' residency, but not joined in by Marion "Bid" Smith, Registrar, the named defendant), the Ninth Court of Appeals for the State of Texas stayed the issuance of the injunction by order dated October 4, 2000.

Later that day, plaintiffs here filed in this court an action seeking a Temporary Restraining Order against "Bid" Smith and the intervenors in the state court action from mailing any further confirmation notices, alleging such actions were in violation of the National Voting Rights Act originally passed in 1965, as amended in 1970, 1975, and 1982.

The individual judge to whom this case was assigned granted the Temporary Restraining Order, and set a hearing for October 6, 2000, which was held on that date. The plaintiffs here sought a three-judge court as provided by Title 28 United States Code § 2284 and Title 42 United States Code § 1973c (§ 5 of the Voting Rights Act). After the hearing, this judge extended the Temporary Restraining Order, made findings, and sought the designation of a three-judge court by the Chief Judge of the United States Court of Appeals for the Fifth Circuit. That same day, the designation was made by Chief Judge Carolyn Dineen King, designating this panel.

The hearing before us was held on October 25, 2000. At that hearing, counsel for plaintiffs submitted the record of the October 6, 2000, hearing and offered the testimony of two witnesses, Ms. Ann McGeehan, the Director of the Elections Division of the Texas Secretary of State, and Mr. Marion "Bid" Smith, the Polk County Tax Assessor–Collector and Registrar of Voters. The court admitted the record of the October 6 hearing into evidence, and the transcript of the testimony given at the two previous state hearings, and other documents, and heard the two witnesses and the arguments by counsel for plaintiffs, the defendant, and the intervenors.

The plaintiffs' fundamental complaint can be summarized as asserting two causes of action. First, plaintiffs contend that the *en masse* challenge to the voting residence of the Escapees whereby each individual challenger was allowed to submit a sworn affidavit challenging the residency of over 9,000 of the Escapees was a method not previously used by the state of Texas and therefore constituted a change in standard, practice, or procedure requiring preclearance under the Act. Second, plaintiffs contend that the individual members of the Escapees were previously permitted to register and vote as Polk County residents (and apparently still are) under the Texas Election Code and that sending confirmation notices to the Escapees challenged in the September 11, 2000, affidavits consti-

tutes recognition of a change in voting residency qualifications or prerequisites by the Registrar of Polk County, which requires preclearance.

## II. Scope of review by the three-judge District Court.

■ In a Voting Rights Act case, the issue before the court is limited to the scope of § 5 of the Act. A three-part inquiry must be made: (1) whether there was a change in the procedures administering a covered action that was subject to preclearance under § 5; (2) whether the requirements of § 5 were respected; and (3) if not, what permissible remedy is appropriate. *See Henderson v. Graddick*, 641 F.Supp. 1192, 1198 (M.D.Ala.1986).

■ Although the thrust of the Act is to preclude the denial or abridgment of the right to vote based on race or color, we may not consider any actual discriminatory purpose or effect in arriving at our conclusion. *See Allen v. State Board of Elections*, 393 U.S. 544, 570, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). The proper review is whether the change has the potential for discrimination and hence is subject to § 5 preclearance requirements. *See Dougherty County Board of Education v. White*, 439 U.S. 32, 36, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978).

The plaintiffs here note that there are some minorities within the ranks of the Escapees. In fact, one of the named plaintiffs, Ms. Brenda Neil, is African–American. However, testimony in the October 6 hearing leads us to believe that, overall, a relatively small fraction of the Escapees are members of a minority within the protective intent of the Act. Counsel for plaintiffs has not seriously argued that there has been any discriminatory thrust based on race or color behind the residency challenge. However, whether there is a real charge of racial discrimination in a complaint taken pursuant to § 5 is immaterial. As the U.S. Supreme Court stated in *Morse v. Republican Party of Virginia*,

First, while it is true that the case before us today does not involve any charge of racial discrimination in voting, the decision whether discrimination has occurred or was intended to occur, as we have explained on many occasions, is for the Attorney General or the District Court for the District of Columbia to make in the first instance. *Citations omitted.* The critical question for us, as for the District Court below, is whether "the challenged alteration has the *potential* for discrimination."

*Morse v. Republican Party of Virginia*, 517 U.S. 186, 216–17, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) (emphasis in original).

Therefore, we examine the evidence not from the perspective of whether the changes claimed by the plaintiffs had a discriminatory intent or effect in this case, but rather whether such non-precleared changes would provide the potential for discrimination in either the November 7, 2000, national election or any future election.

## III. *En masse* challenge.

■ In the state court proceedings, the *sufficiency* of the sworn affidavits used to challenge the residency of the Escapees has also been attacked. The sufficiency of the challenges—e.g., whether they meet Texas law in terms of adequacy of voter identification or the affiant's personal knowledge—is not the controlling issue before this court, however. That remains an issue for the Texas state courts to determine. What we must determine is whether allowing an *en masse* challenge of this scope (approximately 25% of the Polk County registered voters), particularly in such close proximity to a national election date which also encompasses several narrowly contested local races, constitutes a change in the challenge standard, practice, or procedure which has been impermissibly initiated without preclearance under § 5.

The Texas Election Code does not have a specific provision governing an *en masse* voter residency challenge. It does provide for the right to challenge voter registra-

tion. "Except as otherwise provided by this subchapter, a registered voter may challenge the registration of another voter of the same county at a hearing before the registrar." Tex.Elec.Code § 16.091. Section 16.092 requires a voter who challenges a registration to file a sworn statement of the grounds for the challenge with the registrar. If a challenge is based on residency, however, § 16.0921 requires that the challenge/confirmation process be used. Subparagraph (a) states: "On the filing of a sworn statement under Section 16.092 alleging a ground based on residence, the registrar shall promptly deliver to the voter whose registration is challenged a confirmation notice in accordance with Section 15.051." The plain language of the Code is written in the singular. However, that does not necessarily mean that a single voter may only challenge one other voter, nor that a single voter may only challenge one other voter in a single written challenge.

This issue was submitted in 1983 to the Texas Secretary of State, then the Honorable David A. Dean. The specific question was posed by The Tax Assessor–Collector of Hays County, Texas. It asked, "Whether an individual may challenge voters *en masse* with a single affidavit?" Secretary of State Dean's opinion was published saying:

> It is my opinion that a single affidavit filed as a challenge of more than one voter is acceptable if: (1) the affidavit properly identifies each challenged voter; and (2) the affidavit states a challenge, based upon personal knowledge, that each challenged voter does not possess a specific qualification for remaining registered.

Op.Tex. Sec'y of State No. DAD–73 (1983).

It is important to note that DAD–73 was issued in 1983, before the submission of the newly created draft Texas Election Code to the Department of Justice in 1984. If the analysis of this court required greater depth, it would be necessary to determine whether DAD–73 had been included as part of the submission for review. In response to a question on this point before this court, the representative of the Secretary of State, Ms. McGeehan, did not give a definitive answer.

However, such an in depth analysis is not necessary. Although the Code speaks in the singular, DAD–73 clearly establishes that a single voter is not limited to challenging only one other voter on the basis of residency. Regardless, it is instructive that DAD–73 answers the question of whether *"en masse"* challenges may be filed with an answer that one voter may challenge "more than one" in a single challenge and then goes on to qualify that capability with restrictions that such a challenge properly identify the challenged voter and be based on personal knowledge of the affiant.

At the hearing before us, Ms. McGeehan testified that DAD–73 did not, and the office of the Secretary of State does not, countenance a challenge of this massive a proportion in a single sworn statement, although she could not establish a figure beyond which an *en masse* challenge would be *per se* impermissible. The sheer volume of such a challenge arguably goes beyond the action contemplated in being able to file a challenge against "more than one" appropriately identified individuals based on personal knowledge. On that basis, the fact that the intervenors herein were permitted to do so appears to be a departure from the standard, practice, or procedure established by the Texas Election Code and interpreted by DAD–73, whether DAD–73 was itself considered in the Department of Justice's preclearance review of the Texas Election Code.

Of equal concern to this court is the timing of the challenge. Certainly, states are allowed to police their voting rolls. Title 42 U.S.C. § 1973gg–6 sets the standard by which states may do so. Although that statute requires that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove

the names of ineligible voters from the official lists of eligible voters," an exception is made for a reasonable effort to remove ineligible voters by reason of residency. 42 U.S.C. § 1973gg–6(c)(2)(A)–(B). We recognize that the Texas Election Code is written in conformance with that standard and establishes no other time limit for clearing the rolls by reason of residency. We further recognize that the Texas Election Code works to place challenged voters on a suspense list for future removal after additional safeguards have been met.

Nonetheless, the timing of the challenges in this case has the potential to unfairly rush the statutory voter challenge process in that the traveling Escapees who do not promptly receive their confirmation notices, recognize them for what they are, and file a response within 30 days of the mailing of the confirmation notices will be placed on a suspense list and their votes effectively discarded. The affidavits were filed, challenging over 9,000 persons, 57 days before the November 7th election. Clearly, the circumstances of the Escapees' residency could have been recognized and challenged far in advance of September 11, 2000. That would have permitted an orderly identification of those who are not Texas residents, and clearing them from the Polk County rolls, while permitting enough time for those who are genuine residents of Polk County to resolve any conflict imposed by time and travel.

The potential for discrimination on the basis of race or color by the use of this method, challenging a massive number of similarly situated individuals' qualification to vote by surprise within too short a time to rectify any conflicts arising thereby, has already been demonstrated within the jurisprudence of actions under the Voting Rights Act. *See generally Edwards v. Sammons,* 437 F.2d 1240 (5th Cir.1971) (wherein 150 black citizens were "purged" from the voters list for failure to pay city ad valorem taxes, a prerequisite for voting, a week prior to a general election for mayor and city council in Fort Valley, Georgia).

Such an action, representing a change from "more than one" to over 9,000 in one fell swoop, coupled with the timing of the challenges before us, must be precleared in accordance with § 5 of the Voting Rights Act.

## IV. Change in residency requirements.

█ Plaintiffs also contend that the confirmation action by the Polk County Registrar, "Bid" Smith, is recognition by a state subdivision that the Escapees, who maintain they are residents of the Rainbow's End RV Park, do not meet the qualification for voting residence under the Texas Election Code. Since the Escapees were previously permitted to obtain residency in Polk County as a prerequisite to registering to vote, plaintiffs contend this constitutes a change to their qualifications or prerequisites to voting, requiring preclearance under § 5.

Defendant, and the intervenors especially, have contended that the Texas Election Code is precleared in its entirety, including the provisions governing the challenge of qualifications for Texas residency. Further, they contend that the confirmation notice process is a ministerial one under the Code and that the registrar has no discretion in carrying it out. On that basis, they assert that no preclearance is necessary and that "Bid" Smith acted properly, with no discretion to do otherwise, in accordance with a precleared state code.

It is uncontested that the Escapees have been permitted to claim they are residents of Texas and Polk County under the Texas Election Code. Plaintiffs point to Polk County's April 30, 1999 submission to the Voting Rights Section of the U.S. Department of Justice seeking preclearance for the proposed establishment of voting precincts 19 and 20 at Rainbow's End. The second paragraph of the submission's cover letter includes the assertion that, "Independent Counsel for the County has consulted with the Secretary of State, verifying that the individuals living

within the confines of the Escapees compound clearly meet the liberal residence requirements of the Texas Election Code Sec. 1.005(17) and Sec. 1.015(a–d)." It also makes clear that the Escapees registered voters numbered, at that time, 7,780 individuals who claimed a "suite" address at Rainbow's End while traveling around the country in their RV's. The Department of Justice lodged no objection to the proposed voting precincts in its June 29, 1999, response by the Chief of the Voting Section.

The defendant Smith and the intervenors assert the triggering of confirmation notices by the residency challenges does not require separate preclearance because the state statutory scheme under which it is carried out mandates such action without discretion on the part of the registrar. Although the confirmation notice process is necessarily founded on the assertions made in the affidavits that the Escapees are not qualified voters because they are non-residents, they claim the process is merely ministerial in nature and thus not subject to separate preclearance.

Texas Election Code § 16.0921(a) does require that, on the filing of a sworn statement alleging a ground based on residence, the registrar shall promptly deliver a confirmation notice to the voter whose registration is challenged. "Bid" Smith commenced this process promptly and precisely in accordance with the Code. He did so without apparent discretion in the matter, which is a ministerial effort in response to a triggering event under state law. Further, before taking action, he consulted the Secretary of State's Office and testified that he proceeded in accordance with their advice. Acting as a faithful public servant in this manner, "Bid" Smith was almost instantly beleaguered by complaints and imprecations demanding he alternatively cease and desist as a matter of fairness or press on in accordance with the letter of the law. The Texas Secretary of State then sued for an injunction against his further action. He was subject to public outcry by the Escapees and in the press, while the so-called "permanent" residents of Polk County who challenged the Escapees' residency pressured him to continue the confirmation process. The nature and volume of this response to "Bid" Smith's commencement of the confirmation process is a signal flag that the "ministerial" action under the precleared Texas Election Code may have required review in and of itself.

■ Preclearance of a state statute does not shelter a specific action taken under that statute if the preclearance submission made by the state to the Department of Justice is insufficient to put that agency on notice that the state is seeking to employ that specific action. *See Foreman v. Dallas County*, 521 U.S. 979, 981, 117 S.Ct. 2357, 138 L.Ed.2d 972 (1997) (holding that the change in procedure for selecting election judges which was made by Dallas County, Texas, under the precleared language of the Texas Election Code, required separate preclearance. The language submitted to the U.S. Department of Justice for review was insufficient to put that agency on notice that such a change was contemplated). Therefore, if the submission of the draft Texas Election Code and its later changes were insufficient to put the Department of Justice on notice that the state could change its interpretation of the proper qualifications or prerequisites for an individual to obtain residence for voting purposes, then any action taken to administer the non-precleared qualifications or prerequisites would require its own separate preclearance.

As in the previous analysis, precisely what constitutes Texas residency is not a controlling issue before this court. That, too, remains an issue for the state of Texas to determine, either on the continued basis of its common law or through legislative enactment. The issue before us is simply whether the Escapees were allowed to become residents for voting purposes and whether the process of issuing *en masse* confirmation notices triggered by a challenge meeting the requirements of the

Texas Election Code requires separate preclearance under § 5.

Additionally, acts by a political subdivision of a state which are simply ministerial in nature and taken in response to state law may be subject to separate preclearance when the interests enumerated in § 5 of the Voting Rights Act are invoked. *See Lopez v. Monterey County,* 525 U.S. 266, 278, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999) (agreeing that a covered jurisdiction (Monterey County) "seeks to administer" a voting change even where the jurisdiction exercises no discretion in giving effect to a state-mandated change, requiring § 5 preclearance before implementation). The fact that, in *Lopez,* Monterey County was covered under § 5 while the state of California was not so covered is unimportant. The salient issue is that where a subdivision of a state takes "ministerial" action in accordance with state law whereby a change in voting practice occurs, that subdivision is seeking to administer such a change. That in and of itself requires preclearance where there is potential for discrimination.

Although the confirmation action employed by "Bid" Smith was strictly in accordance with the Texas Election Code, was undertaken without discretion, and was ministerial in nature, it was necessarily predicated on the allegations of the persons challenging the Escapees' right to vote. In that challenge, several identically worded affidavits asserted that the Escapees "are not 'qualified voters' because they are not residents of Polk County, Texas" on the basis that they rent space at the RV park, have mail forwarded out of county, and have several individuals assigned to single lots. Initiating residency confirmation action, whether ministerial or not, on this assertion is equivalent to administering the voters rolls in Polk County based on a change in the prerequisites or qualifications to obtain residency.

A challenge to the voting eligibility of a large block of similarly situated voters, who are mobile and whose residency is based on a state code definition which is open to interpretation different from that identified to the Department of Justice, has the potential for being used in a discriminatory manner. Plaintiffs have offered the hypothetical of a group of minority migrant farm workers who might be disenfranchised or whose right to vote might be burdened by such a challenge. Since such a process has the potential for discrimination, it must receive separate preclearance whether the process is "ministerial" or not.

Counsel for the defendant and for the intervenors ask how the responsible public official in a situation such as this should know he must depart from state law and submit a non-discretionary action for preclearance under the Voting Rights Act before implementing it. Certainly, here, "Bid" Smith was faced with a Hobson's choice which he fairly and faithfully tried to implement. Regardless, any time a potential change in that most crucial right, the right to vote, for a large number of previously registered voters is implied, such a consideration as to whether preclearance is necessary must be made.

## V. Preliminary injunction.

Having determined, first, that the actions taken by the Polk County Registrar required preclearance in accordance with § 5 of the Voting Rights Act, and, second, that such preclearance was not sought nor obtained, we now turn to the proper remedy. It is our holding that a preliminary injunction be entered prohibiting defendant from pursuing the confirmation of residence of the Escapees, or any similarly situated group, under the Texas Election Code until such time as the process itself has been submitted for preclearance by either the U.S. District Court for the District of Columbia or the U.S. Department of Justice in accordance with § 5. This action is taken to ensure no discriminatory potential exists in the use of such a process in either the upcoming November 7, 2000, election nor in any future election.

The court retains jurisdiction of this case for the entry of any further orders deemed necessary.